[No. G002587. Fourth Dist., Div. Three. Jan. 29, 1988.]

DAVID LEEB et al., Plaintiffs and Appellants, v.
JAMES DeLONG et al., Defendants and Respondents.

**COUNSEL**

Paul Hoffman, Gary Williams and Susan Borges for Plaintiffs and Appellants.

Ronald D. Wenkart, James P. Aynes and Bobbie F. Albanese for Defendants and Respondents.

Kronick, Moskovitz, Tiedemann & Girard and Robert A. Rundstrom as Amici Curiae on behalf of Defendants and Respondents.

OPINION

**CROSBY, Acting P. J.**—May a school district censor material reasonably believed to contain an actionable defamation from an official campus newspaper? *Yes.*

I

David Leeb was the student editor of the Rancho Alamitos High School Newspaper, La Voz del Vaquero. Rancho is a public high school in the Garden Grove Unified School District, and the newspaper is faculty supervised.

On March 29, 1984, Leeb submitted the proposed April 1 edition to James DeLong, Rancho's principal, for approval. The newspaper traditionally publishes an April Fool's Day spoof. This one, for example, reported that rock star Michael Jackson was planning a concert at the school, the Los Angeles Raiders professional football team had scheduled a game with the Rancho squad, and spring break had been canceled for lack of interest. On the second page, a small disclaimer stated, "All the stories and announcements in this issue . . . are fabrications of the mind." (Read literally, the disclaimer itself was, of course, a "fabrication[ ] of the mind.")

On the third page an article appeared under the headline "Nude Photos: Girls of Rancho." Prepared with the advice and consent of the journalism instructor, it was nonetheless the catalyst for the present controversy. According to the article, the July issue of Playboy magazine would carry nude photographs of distaff Rancho students and those interested in posing should sign up at the school darkroom. The photos would be taken on April 23 in 10- to 15- minute sessions, followed by short interviews. The article was accompanied by a photograph of five fully clothed female students standing in line with their school books, purportedly with applications in hand. DeLong recognized each of them.

Between April 2 and 4, DeLong spoke with the five coeds and obtained written statements from them. He concluded the young ladies did not give a totally informed consent to the use of the photograph. Several did not mind, however, and later executed declarations in support of Leeb.

DeLong also spoke with the father of one of the depicted students. According to the principal, "he expressed his anger, shock and outrage to me and stated that the picture invaded his daughter's privacy and was damaging to his daughter's reputation. He felt that the article and the photograph might subject his daughter to ridicule." This parent submitted a declaration

on behalf of DeLong in the trial court in which he repeated his objections to the article and picture and alluded to potential legal action if it were to be published.

DeLong himself formed the opinion that "the article and the photograph taken together are damaging to the reputation of each of the girls in the photograph in that [they] attempt[] to portray these high school girls as waiting in line to have their photographs taken in the nude." He was also of the view that the reputation of the school and the school district would be injured by publication of the material. DeLong noted that the edition was not meant to be taken seriously, but found "the disclaimer was so inconspicuous and difficult to see that I felt many readers may believe the article to be a true factual statement." On April 2, he prohibited distribution of the newspaper. It was apparently too late and impractical to merely delete the offending article. He also advised Leeb that he could appeal the decision to the associate superintendent, the superintendent, and then to the governing board. Leeb sought inmediate review by the associate superintendent and the superintendent; both supported DeLong.

The district's regulations do not literally provide for review by the governing board, or any review at all for that matter (see fn. 12, *infra*); but the evidence before the trial court was that the board would have considered the question if it had been brought to its attention. Leeb, who was a Rancho ex-officio student representative on the board, never raised it at a meeting, although he had every opportunity to do so at three sessions held after the superintendent's rejection of his appeal. Also, although Leeb's administrative appeals failed, he was permitted to publish an article on April 27 criticizing the superintendent's refusal to overturn DeLong's ban of the April 1 edition.

Claiming section 48907 of the Education Code and the district's administrative regulation adopted pursuant to that section—both of which provide for prior restraints with respect to official student publications in certain limited situations—violate the free press provision of the California Constitution, article I, section 2, Leeb unsuccessfully sought a temporary restraining order and a preliminary injunction. The lawsuit was terminated in favor of the school district on cross-motions for summary judgment, and this appeal followed.

## II

Whether this particular edition of the newspaper should be published is, as a matter of fact, moot; but the constitutional issue raised is of continuing public interest and likely to recur in circumstances where, as

here, there is insufficient time to afford full appellate review.[1] Thus, it is appropriate to resolve the matter, notwithstanding the passage into history of April 1, 1984. (*John A. v. San Bernardino City Unified School Dist.* (1982) 33 Cal.3d 301, 307 [187 Cal.Rptr. 472, 654 P.2d 242]; *Gordon J. v. Santa Ana Unified School Dist.* (1984) 162 Cal.App.3d 530, 533 [208 Cal.Rptr. 657].)

■ *Private* publishers are responsible for their publications and ordinarily have unfettered control over the contents, i.e., the absolute power of censorship. (*Miami Herald Publishing Co. v. Tornillo* (1974) 418 U.S. 241; cf. *Pines v. Tomson, supra,* 160 Cal.App.3d 370.) An editor's power is derivative of, and entirely subordinate to, that of the publisher.[2]

The other side of the censorship coin is that aspiring authors and advertisers have no right to insist on the publication of their works and notices. The United States Supreme Court has stated the general rule rather succinctly: "[T]he constitutional right of free speech has never been thought to embrace a right to require a journalist or any other citizen to listen to a person's views, let alone a right to require a publisher to publish those views in his newspaper . . . ." (*Pell v. Procunier* (1974) 417 U.S. 817, 821-822 [41 L.Ed.2d 495, 501, 94 S.Ct. 2800]; *Avins v. Rutgers, State University of New Jersey* (3d Cir. 1967) 385 F.2d 151, cert. denied (1968) 390 U.S. 920.) Even persons willing to pay for the space have no *constitutional* right of uncensored access to the pages of a publication. (*Associates & Aldrich Company v. Times Mirror Company* (9th Cir. 1971) 440 F.2d 133; *Chicago Joint Bd., Amal. Cloth. Wkrs. v. Chicago Tribune Co.* (7th Cir. 1970) 435 F.2d 470, cert. denied (1971) 402 U.S. 973 [29 L.Ed.2d 138, 91 S.Ct. 1622]; cf. *Pines v. Tomson, supra,* 160 Cal.App.3d 370.) One solid justification for this is the following: The publisher may be held responsible in a defamation action for *all* the contents of the publication, including paid advertisements. (See, e.g., *New York Times Co. v. Sullivan* (1964) 376 U.S. 254.)

---

[1] Leeb has confined his attack in this court to a claimed violation of the Constitution of California. Below he also argued the article was not defamatory as a matter of law. We express no opinion on that issue. (See discussion *infra* at pp. 62-63.)

Article I, section 2, subdivision (a) of the California Constitution, this state's more liberally construed version of the First Amendment (*Wilson v. Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116]; *Pines v. Tomson* (1984) 160 Cal.App.3d 370, 394 [206 Cal.Rptr. 866]), provides, "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

[2] California's libel retraction statute requires service on the publisher; service on the editor, although he is the publisher's agent, is simply not effective. (Civ. Code, § 48a, subd. 1; *Farr v. Bramblett* (1955) 132 Cal.App.2d 36, 44 [281 P.2d 372], disapproved on another point in *Field Research Corp. v. Superior Court* (1969) 71 Cal.2d 110, 114, fn. 4 [77 Cal.Rptr. 243, 453 P.2d 747].)

■ With these observations in mind, we turn to the crux of the present matter: Is a statute which accords broad free press rights to public high school students nonetheless repugnant to the Constitution of California because it also allows school officials a very limited right to censor *official* high school publications? Most of the cases Leeb cites condemning prior restraints on campus are beside the point. They are access and distribution cases in the main, generally involving so-called underground newspapers, not official organs of the school. (*Papish* v. *University of Missouri Curators* (1973) 410 U.S. 667 [35 L.Ed.2d 618, 93 S.Ct. 1197]; *Bright* v. *Los Angeles Unified Sch. Dist.* (1976) 18 Cal.3d 450 [134 Cal.Rptr. 639, 556 P.2d 1090]; *Nitzberg* v. *Parks* (4th Cir. 1973) 525 F.2d 378; *Shanley* v. *Northeast Ind. Sch. Dist., Bexar County, Tex.* (5th Cir. 1972) 462 F.2d 960; *Fujishima* v. *Board of Education* (7th Cir. 1972) 460 F.2d 1355; and *Eisner* v. *Stamford Board of Education* (2d Cir. 1971) 440 F.2d 803.) Similarly, *Tinker* v. *Des Moines School Dist.* (1969) 393 U.S. 503 concerned the wearing of black armbands as a political protest, and both *Baughman* v. *Freienmuth* (4th Cir. 1973) 478 F.2d 1345 and *Riseman* v. *School Committee of City of Quincy* (1st Cir. 1971) 439 F.2d 148 dealt with the distribution of privately produced pamphlets on high school campuses.[3]

In making his state constitutional attack, it is somewhat ironic that Leeb so heavily relied on federal authority. A recent decision of the United States Supreme Court on virtually identical facts has specifically rejected his contentions under the federal Constitution. In *Hazelwood School District* v. *Kuhlmeier* (1988) 484 U.S. 260 [98 L.Ed.2d 592, 108 S.Ct. 562], that court held in a 5-3 decision that "educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. . . . may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences. [¶] Educators are entitled to exercise greater control over this . . . form of student expression to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school. Hence, a school may in its capacity as publisher of a school

---

[3] Indeed, the right to distribute may extend to *private* property where its use is similar to that of a civic center. *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899, affirmed *sub nom. Pruneyard Shopping Center* v. *Robins* (1980) 447 U.S. 74, for example, recognized the right of the petitioner high school students to distribute handbills and solicit signatures in a large private shopping center to protest a resolution of the United Nations.

newspaper or producer of a school play 'disassociate itself,' [citation], not only from speech that would 'substantially interfere with [its] work . . . or impinge upon the rights of other students,' [citation], but also from speech that is, for example, ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences." (*Id.,* at p. __ [98 L.Ed.2d at p. 605], fns. omitted.)

If *Kuhlmeier* were specifically applicable in California, little more would have to be said. But it is not. Section 48907 of the Education Code and California decisional authority clearly confer editorial control of official student publications on the student editors alone, with very limited exceptions.[4] The broad power to censor expression in school sponsored publications for pedagogical purposes recognized in *Kuhlmeier* is not available to this state's educators. Nonetheless, Leeb insists the exceptions to the rule provided in Education Code section 48907 offend the Constitution of California. In resolving this contention we first review this state's decisional authority and then turn to a discussion of the Legislature's response in Education Code section 48907.

*Bailey* v. *Loggins* (1982) 32 Cal.3d 907 [187 Cal.Rptr. 575, 654 P.2d 758] (a five-opinion, four-to-three decision) is our Supreme Court's most important decision concerning the government's ability to regulate the content of its own sponsored publications. Although it involved a prison newspaper,

---

[4] Education Code section 48907 provides, "Students of the public schools shall have the right to exercise freedom of speech and of the press including, but not limited to, the use of bulletin boards, the distribution of printed materials or petitions, the wearing of buttons, badges, and other insignia, and the right of expression in official publications, whether or not such publications or other means of expression are supported financially by the school or by use of school facilities, except that expression shall be prohibited which is obscene, libelous, or slanderous. Also prohibited shall be material which so incites students as to create a clear and present danger of the commission of unlawful acts on school premises or the violation of lawful school regulations, or the substantial disruption of the orderly operation of the school. [¶] Each governing board of a school district and each county board of education shall adopt rules and regulations in the form of a written publications code, which shall include reasonable provisions for the time, place, and manner of conducting such activities within its respective jurisdiction. [¶] Student editors of official school publications shall be responsible for assigning and editing the news, editorial, and feature content of their publications subject to the limitations of this section. However, it shall be the responsibility of a journalism adviser or advisers of student publications within each school to supervise the production of the student staff, to maintain professional standards of English and journalism, and to maintain the provisions of this section. [¶] *There shall be no prior restraint of material prepared for official school publications except insofar as it violates this section.* School officials shall have the burden of showing justification without undue delay prior to any limitation of student expression under this section. [¶] 'Official school publications' refers to material produced by students in the journalism, newspaper, yearbook, or writing classes and distributed to the student body either free or for a fee. [¶] Nothing in this section shall prohibit or prevent any governing board of a school district from adopting otherwise valid rules and regulations relating to oral communication by students upon the premises of each school." (Italics added.)

*Bailey* relied upon several high school and college newspaper cases. Those decisions, like the bulk of the authority cited by counsel for Leeb, however, involved federal applications of First Amendment principles. To that extent, the continuing viability of *Bailey* is open to question. Nonetheless, *Bailey* appears to base its holding on both the federal and state Constitutions (see, e.g., 32 Cal.3d at p. 922); and we continue to be bound by its interpretation of the Constitution of California.

*Bailey* pointedly differentiated between the rights of public publishers and their private counterparts. The newspaper in *Bailey* was "financed by the inmate welfare fund, not by the taxpayers." (*Id.,* at pp. 910-911, fn. omitted.) Nevertheless, it was established by the Department of Corrections and subject to its regulations, the constitutionality of which formed the question before the court. (*Id.,* at p. 915.) The court stated, "We . . . reject the claim that the state as publisher enjoys the same total control over the content of the newspaper as a private publisher. [Citation.] That contention overlooks the critical distinction between a government as publisher and a private publisher. [Citation.] When identical claims based on the state's right as publisher have been asserted to justify censorship of high school and college newspapers, the courts have emphatically rejected those claims. . . . [T]he state, having established an activity which has the elements of free expression, must take account of First Amendment considerations in restricting that expression." (*Id.,* at pp. 918-919, fns. omitted; see also *Bazaar* v. *Fortune* (5th Cir. 1973) 476 F.2d 570, 574, mod. 489 F.2d 225, cert. denied (1974) 416 U.S. 995.)

A publication's *raison d'etre* obviously bears some relationship to the analysis, for few would contend that students in an ordinary journalism or English class retain the slightest First Amendment freedom with respect to their course work. As Justice Kaus explained in his *Bailey* dissent, "suppose that as part of a prison course in writing the instructor had asked the students to write an essay on 'Why My Trial Counsel Was Incompetent.' Suppose further that an inmate refused to write on that subject, but handed in an essay on 'The Concept of Peace in Early Celtic Literature.' Would anyone doubt that the instructor could take appropriate action to try and make the student conform to the demands of the course? The student's mission was to write within the confines of a theme prescribed by the instructor and he failed to do so. Surely he cannot appeal to 'free speech' or cry 'censorship' to avoid a failing grade. To me the prison paper is no different: its mission is to educate, to rehabilitate and to inform within clearly designated limitations. It is not intended as a 'forum for the expression of ideas.'" (*Bailey* v. *Loggins, supra,* 32 Cal.3d at p. 930 (dis. opn. of Kaus, J.).) This view was not adopted by the majority in *Bailey,* however, as it essentially was by the United States Supreme Court in *Kuhlmeier*; the

majority found the prison newspaper was "intended to serve . . . as a limited forum for prisoner expression . . . ." (*Id.*, at p. 917.) Moreover, the sanction of a "failing grade" is far different from that of a prior restraint.

Our record provides no explanation of the district's purpose in publishing the Rancho newspaper; but, apart from the goal of rehabilitation, we assume it is similar to that of prison newspapers. Like Justice Kaus, we perceive the primary intended function to be the education and development of the journalistic talents of the staff members. (Any mission to inform, of course, could not have been fulfilled in this disinformation issue.) If there is a secondary purpose to provide a forum for ideas, it is probably slight by comparison. Nonetheless, we are compelled to follow the views of the majority in *Bailey* and must classify this publication as a limited forum, at least in terms of prior restraints under the California Constitution.

■ A forum may be labeled public, nonpublic, or limited. A public forum is the traditional soap box in a town square: No one may be denied access, and prior restraints are rarely permissible. (See *Near* v. *Minnesota* (1931) 283 U.S. 697 and *Wilson* v. *Superior Court, supra,* 13 Cal.3d 652.) An example of a nonpublic forum in the present context would be a "house organ," such as a school bulletin for the dissemination of educational or administrative information to students or faculty: School officials retain full power to regulate access and content.

The so-called limited forum theory springs from the notion that government publishers do not enjoy unrestricted freedom to engage in content-based censorship in certain circumstances. In a limited forum the ability of government to regulate expression is greatly reduced, but the government may restrict access to the forum consistent with the purposes for which it was created. (*Cornelius* v. *NAACP Legal Defense & Ed. Fund* (1985) 473 U.S. 788 [87 L.Ed.2d 567, 105 S.Ct. 3439]; *Perry Ed. Assn.* v. *Perry Local Educators' Assn.* (1983) 460 U.S. 37; *Lehman* v. *City of Shaker Heights* (1974) 418 U.S. 298 [41 L.Ed.2d 770, 94 S.Ct. 2714]; *Avins* v. *Rutgers, State University of New Jersey, supra,* 385 F.2d 151; Shiffrin, *Government Speech* (1980) 27 UCLA L.Rev. 565.) High school newspapers have been held to fall into the limited forum category.[5] (*San Diego Committee* v. *Governing Bd.* (9th Cir. 1986) 790 F.2d 1471, 1476-1478.)

---

[5] Curiously, neither the majority nor the dissent addresses the limited forum notion at all in *Hazelwood School District* v. *Kuhlmeier, supra,* 484 U.S. 260. The majority considered only the seemingly self-evident problem of whether the school-sponsored high school newspaper in that case was a *public* forum. (*Id.,* at pp. __-__ [98 L.Ed.2d at p. 602].) The *Kuhlmeier* dissent was grounded on an entirely different point, i.e., that student rights to free expression are

■ At least by statute a school newspaper is a limited forum in this state, but to what extent may the government publisher exercise its restricted right to control the content of the publication? In terms of the present case, was it constitutionally permissible to impose the limited prior restraint the Legislature authorized in Education Code section 48907 or was discipline after the fact the only lawful response?

In *Bright* v. *Los Angeles Unified Sch. Dist., supra,* 18 Cal.3d 450, a case dealing with the right to distribute an underground newspaper on a high school campus, our Supreme Court analyzed a statutory predecessor of Education Code section 48907 and concluded that while prior restraints might be permissible in the high school setting, the statute did not then authorize them.[6] (*Id.,* at p. 464.) Education Code section 48907 was the Legislature's response to *Bright,* and, as noted above, it does expressly provide for a limited form of censorship, but only in school sponsored publications.

■ While defamatory speech is often described as "not worthy of constitutional protection" (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 340 [41 L.Ed.2d 789, 805, 94 S.Ct. 2997]; *Garrison* v. *Louisiana* (1964) 379

equally protected by the First Amendment in all student publications, school sponsored or not.

The majority in the court of appeals *had* characterized the newspaper as a public forum, but it appears to have had limited forums in mind. (*Kuhlmeier* v. *Hazelwood School Dist.* (8th Cir. 1986) 795 F.2d 1368, cert. granted (1987) 479 U.S. 1053 [107 S.Ct. 926].) If a school newspaper were a public forum, anyone would have the right to use its pages. (See *Cornelius* v. *NAACP Legal Defense & Ed. Fund, supra,* 473 U.S. 788 and *San Diego Committee* v. *Governing Bd., supra,* 790 F.2d 1471, 1476-1478.) Such arguments *have* been made before, as noted above at p. 52, but with little success. (Cf. *Pines* v. *Tomson, supra,* 160 Cal.App.3d 370 [206 Cal.Rptr. 866].)

[6]The court also specifically left open the possibility that school officials may impose prior restraints on the distribution of even privately produced libelous material in high schools, noting that federal courts have acknowledged the possibility without actually upholding any such restraints. (*Id.,* at pp. 463-464; but compare *Hazelwood School District* v. *Kuhlmeier, supra,* 484 U.S. 260, ___ [98 L.Ed.2d 592, 605] and *Fujishima* v. *Board of Education, supra,* 460 F.2d 1355 with *Tinker* v. *Des Moines School Dist., supra,* 393 U.S. 503, 513.) If a school district might be able to constitutionally ban privately produced student publications (which it cannot under Education Code section 48907), it surely ought to be able to impose prior restraints on its own official student productions in certain circumstances.

In the special case of obscenity, prior restraints against even private publishers have been upheld to deny access to minors. (*FCC* v. *Pacifica Foundation* (1978) 438 U.S. 726 [57 L.Ed.2d 1073, 98 S.Ct. 3026]; *Ginsberg* v. *New York* (1968) 390 U.S. 629 [20 L.Ed.2d 195, 88 S.Ct. 1274].) By contrast, school boards may not remove books from libraries based merely on the ideas contained in them. (*Board of Education* v. *Pico* (1982) 457 U.S. 853 [73 L.Ed.2d 435, 102 S.Ct. 2799].)

U.S. 64, 75 [13 L.Ed.2d 125, 133, 85 S.Ct. 20]), the First Amendment and article I, section 2, subdivision (a) of the California Constitution clearly do not permit the prior restraint of the *private* publication of libelous material. (*Near* v. *Minnesota, supra,* 283 U.S. 697; *Dailey* v. *Superior Court* (1896) 112 Cal. 94 [44 P. 458].) If there is a remedy for libel in a particular setting, it is an action for damages after publication. ▮ Nevertheless, sound precedent and some rather obvious practical considerations support the school administration's right to censor actionable defamatory material from official student publications.

The practical considerations are these: Student editors have little incentive to suppress defamatory material. Few would be able to respond in damages, and suspension or expulsion of offenders would not do much to restore the reputations of defamed parties. Where, as here, the prospective victims of the defamation are themselves students, it is nonsensical to contend the Constitution of California requires the school district to publish a libelous treatment of one pupil by another. Surely a school district owes as great a duty to the prospective student victim of a defamation as it does to the student editor-tortfeasor.

Also, a school district shorn of the power to ban speech of the sort that could cause it to be vulnerable in a defamation action would soon determine that the price of publication is too high. A severe diminution of opportunities for student expression would inevitably be the trade-off for the unfettered freedom to publish. Thus, the position advocated by Leeb would, if adopted, defeat his own cause: It would ultimately stifle student expression by greatly reducing the number of available outlets. (*Hazelwood School District* v. *Kuhlmeier, supra,* 484 U.S. 260, __ [98 L.Ed.2d 592, 608, fn. 9].) Finally, if one of the purposes of fostering student journalism is to train the participants for employment in the newspaper business, where a blue pencil poised for defamation prevention will often be encountered, prior restraint for that limited purpose has an appropriate educational purpose. (*Id.,* at p. __ [98 L.Ed.2d at p. 606].)

Consequently, we believe the practicalities of the subject suggest the need for and reasonableness of Education Code section 48907, specifically the power to censor defamatory material from official student publications. Even before *Kuhlmeier,* that right had been rather clearly recognized by the United States Supreme Court. In its landmark decision, *Tinker* v. *Des Moines School Dist., supra,* 393 U.S. 503, the court expressly discussed the

right of schools to curtail speech that would substantially disrupt the educational environment or invade the rights of others. (*Id.,* at p. 513.)[7]

The definition of *Tinker's* phrase "invasion of the rights of others" was an issue before the justices in *Hazelwood School District* v. *Kuhlmeier, supra,* 484 U.S. 260, but the court announced a broader holding supporting the right of the administration to censor school publications for virtually any pedagogical purpose. The court of appeals' opinion, however, turned on this very point. (*Kuhlmeier* v. *Hazelwood School Dist., supra,* 795 F.2d 1368.) The Eighth Circuit held a "conceivable" but not "maintainable" tort action for invasion of privacy insufficient to authorize deletion of offending articles from a high school newspaper. The court observed, "We are persuaded . . . that school officials are justified in limiting student speech, under [the 'invasion of the rights of others'] standard, only when publication of that speech could result in tort liability for the school. Any yardstick less exacting than potential tort liability could result in school officials curtailing speech at the slightest fear of disturbance." (*Id.,* at p. 1376; see Note, *Administrative Regulation of the High School Press* (1984) 83 Mich.L.Rev. 625.)

A dissenting circuit judge in *Kuhlmeier* believed this standard was too restrictive of school administrators' prerogatives. (*Kuhlmeier* v. *Hazelwood School Dist., supra,* 795 F.2d at pp. 1378-1379 (dis. opn. of Wollman, J.).) His conclusion that student newspapers are pedagogical tools, not public (or limited public) forums was eventually adopted by the majority when the case reached the United States Supreme Court. As noted above, Justice Kaus expressed much the same view in his evaluation of prison newspapers in *Bailey* v. *Loggins, supra,* 32 Cal.3d at pp. 928-931 (dis. opn. of Kaus, J.). Nonetheless, we are constrained by the *Bailey* majority's interpretation of

---

[7] We are aware there is another way to eliminate school district exposure to tort litigation, and that is to extend immunity to the district where no control has been exercised over a publication's content by the school administration. This position has its adherents. (See, e.g., *Milliner* v. *Turner* (La.App. 1983) 436 So.2d 1300, cert. denied, 442 So.2d 453; *Mazart* v. *State* (1981) 109 Misc.2d 1092 [441 N.Y.S.2d 600]; Okamoto, *Prior Restraint and the Public High School Student Press: The Validity of Administrative Censorship of Student Newspapers Under the Federal and California Constitutions* (1987) 20 Loyola L.A. L.Rev. 1055, 1130.)

But it is an unsatisfactory approach for a number of reasons. It would provide no remedy in the usual case to the victim of a defamation and would grant to a state-supported institution, operated to a greater or lesser extent by juveniles, a license to libel unique in Anglo-American jurisprudence. Also, the immunity concept does not comport with the intent of the Legislature as expressed in Education Code section 48907, which specifically empowers the district to exercise prepublication control over defamatory material in its own student publications.

Leeb's argument does make sense in the case of underground or unofficial publications. The school is merely a distribution point and has neither a legal responsibility for content nor a corresponding right to censor defamatory material per Education Code section 48907. The power to regulate the time, place, and manner of expression cannot be converted into a right to control content.

the Constitution of California and the language of Education Code section 48907.

The school district and amici curiae argue no interpretation of that section's defamation exception broader than a right to censor to avoid potential tort liability. Their concern is quite straightforward, the avoidance of such liability and nothing more.[8] We are in accord. As Justice Brennan explains, "censorship . . . within the category that *Tinker* described as necessary to prevent student expression from 'invad[ing] the rights of others[ ]' . . . must be limited to rights that are protected by law." (*Hazelwood School District* v. *Kuhlmeier, supra,* 484 U.S. 260 at p. __ [98 L.Ed.2d 592, at p. 617] (dis. opn. of Brennan, J.).)

Thus, construed in light of *Bailey,* Education Code section 48907 does not offend the California Constitution, provided it is understood in terms of the potential tort liability test. A school district in this state may censor expression from official school publications which it reasonably believes to contain an actionable defamation, but not as a matter of taste or pedagogy.[9] (Cf. *Trachtman* v. *Anker* (2nd Cir. 1977) 563 F.2d 512, cert. denied (1978) 435 U.S. 925 [55 L.Ed.2d 519, 98 S.Ct. 1491] [focusing on psychological harm] and *Blackwell* v. *Issaquena County Board of Education* (5th Cir. 1966) 363 F.2d 749 [emphasizing the school's right to maintain order].) Grading or postpublication discipline, if warranted, is adequate to achieve the latter ends.

The tort liability test also assists in resolving some of Leeb's other attacks on the statute. For example, he contends the words "libelous" and "slanderous" are too broad and too vague to pass constitutional muster. The statute is too expansive, he argues, because it fails to recognize that not all defamatory material is actionable. Many utterances are privileged notwithstanding their defamatory nature (Civ. Code, § 47), and a public figure plaintiff must prove malice in addition to falsity. (*Gertz* v. *Robert Welch Inc., supra,* 418 U.S. 323; *Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 875 S.Ct. 1975]; *New York Times* v. *Sullivan, supra,* 376 U.S. 254.) Consequently, read literally, the statute provides a power to censor material in the schoolhouse which could not support an action for damages against a private newspaper in the courthouse.

---

[8] The statute speaks in terms of libel and slander, and we are concerned only with them here. The torts of false light and invasion of privacy, for example, are not within the literal terminology of Education Code section 48907. Whether the statute should be so construed in view of the Legislature's evident design, we leave to another day.

[9] Since it is often difficult to predict the ultimate ruling of the highest reviewing courts in many defamation cases, the statute must be construed to reach "*reasonably* potential," rather than certain, instances of tort liability.

To be sure, ethical journalists ought to set a higher standard for their copy than nonactionable libel. Schools do have a legitimate pedagogical basis for fostering ethics in journalism; and the government "may . . . assert its authority to achieve . . . legitimate . . . objectives, such as vocational training of the person working on the paper. . . ."[10] (*Bailey* v. *Loggins, supra,* 32 Cal.3d 910, 922.) But a school need not employ the ultimate power of censorship to teach journalistic ethics where no viable libel action could ensue; a whole range of postpublication responses is available to the school for that purpose.[11] We agree with Leeb on this point; the statute is overbroad if it is not interpreted to take applicable privileges and rules concerning public figures into account. But this case involves unprivileged communication concerning private individuals.

Leeb's vagueness argument is somewhat more troublesome. Libel and slander cases are difficult for everyone, including lawyers and judges: " 'Libelous' is [a] legal term of art which is quite difficult to apply to a given set of words." (*Baughman* v. *Freienmuth, supra,* 478 F.2d 1345, 1351.) Neither Education Code section 48907 nor the district's implementing regulation, Garden Grove Unified School District Administrative Regulation 7120.1, which adds nothing of substance to the Education Code section (see fn. 12, *infra*), defines the words "libelous" and "slanderous." And neither describes a method for evaluating questioned material. In the court of appeals the dissenting circuit judge in *Kuhlmeier* pegged the point: "The majority opinion consigns officials to chart a course between the Scylla of a student-led first amendment suit and the Charybdis of a tort action by those claiming to have been injured by the publication of student-written material. Although the commercial press can well afford to retain counsel to advise them daily on questions of possible liability, not many school districts possess similar resources." (*Kuhlmeier* v. *Hazelwood School Dist., supra,* 795 F.2d at pp. 1378-1379 (dis. opn. of Wollman, J.).)

We are not unsympathetic to this view. We recognize that the difficult task of evaluating allegedly defamatory material, as required by a "potential tort liability" standard, creates a rule unlikely to satisfy anyone. From the student viewpoint, it may seem to be the journalistic equivalent of a license

---

[10] This is, of course, the current emphasis in the federal decisions. Fostering educational prerogatives (*Hazelwood School District* v. *Kuhlmeier, supra,* 484 U.S. 260), supporting the administration's interest in teaching "socially appropriate behaviour" [*sic*] (*Bethel School Dist. No. 403* v. *Fraser* (1986) 478 U.S. 675, 681 [92 L.Ed.2d 549, 557, 106 S.Ct. 3159, 3164]), and promoting fairness and accuracy by young journalists have all been held to outweigh students' rights to free expression. (See *Nicholson* v. *Board of Educ., etc.* (9th Cir. 1982) 682 F.2d 858, 863.)

[11] In passing, we reject the principal's decision to censor the article in question based in part on the belief it would tarnish the reputation of the school and the district. The mere reputations of government entities may never be defended by censorship in a society governed by the governed.

to kill; to school administrators untrained in the law, it must appear virtually impossible to apply. Yet by confining the scope of section 48907's defamation exception to matters involving a clear risk of a recovery in tort, we have placed the parties in the same situation with respect to allegedly defamatory material as private litigants in a court of law. To hold the words "libelous" and "slanderous" overly vague in that context, we would have to conclude that the defamation laws in general suffer from the same infirmity. This, of course, we are in no position to do.

To summarize, we conclude that to survive constitutional challenge any decision to impose a prior restraint in the case of a possible defamation must, at a minimum, be based on a good faith and objectively rational determination of the probable effect of the challenged speech, i.e., that it contains a false statement (or one that cannot be proved to be true) likely to harm the reputation of another or hold that person up to shame, ridicule, or humiliation. It is not enough that a lawsuit is threatened. Freedom of speech may not be allowed to hinge on the subjective pique of an offended prospective plaintiff in a frivolous or doubtful lawsuit. Prior restraint, although not other disciplinary action necessarily, must yield unless it also appears that an offended plaintiff would have a clear chance of prevailing in a tort action against the school district.

Defamatory material that is not actionable because it is privileged or deals with a public figure without malice may not be censored. For example, an article suggesting that a public official is wrong, illogical, or was a poor choice for office could never lead to a recovery in tort, and for that reason could not be suppressed. A badly researched or sloppily written article containing the same complaint might draw a low grade, however. The district's Administrative Regulation No. 7120.1, currently a mere rehash of Education Code section 48907, should be amended accordingly.[12]  **(6)** The regulation should also require that any decision to delete an item thought to be defamatory should, insofar as it is possible, be limited to the offending material itself.[13]

As noted earlier, Leeb accurately observes that the district's regulation contains no procedural guidelines, not even the time, place, or manner rules

---

[12] The regulation provides, "The Board of Education affirms the principle of freedom of speech and expression by students in the schools of the District. However, where expression, whether verbal or symbolic, materially disrupts class work, causes disorder, or invades the rights of others, appropriate disciplinary measures may be taken to prevent such disruptions and disorder or to protect the rights of others. . . . There shall be no prior restraint of materials prepared for official school publications except where material for publication or expression may: [¶] a. be obscene, libelous, or slanderous; b. incite students as to create a clear and present danger of the commission of unlawful acts on school premises; c. violate lawful school regulations; d. substantially disrupt the orderly operation of the school."

[13] Selective deletion was not practical here apparently; Leeb makes no claim on that score.

mandated by Education Code section 48907. This, too, must be remedied. The regulation should also provide that no prior restraint may be imposed without affording a speedy opportunity to be heard and a swift procedure for administrative review. Leeb concedes that in this particular instance "district officials acted in a prompt and expeditious manner[,] . . . devised an *ad hoc* appeal procedure," and "acted with admirable dispatch." Thus, while it is true that the current regulation fails to adequately set forth a speedy system of review, Leeb has no cause to complain of the niceties of the handling of the present dispute.

We need not determine whether the principal and superintendent of the school district could have entertained a reasonable, good faith belief that the April Fool's edition contained material that might have led to a successful tort action against the district. Leeb briefed the point in the trial court, but he has not done so here. In adopting that tactic he has forced us to face the constitutional issues presented by depriving us of a narrower—and, for him, possibly winning—basis for our decision. He has also, however, waived any right to a review of the district's action on the merits as well. (*In re Marriage of Rhoades* (1984) 157 Cal.App.3d 169, 173, fn. 2 [211 Cal.Rptr. 531].)

■ Consequently, as we have interpreted it, Education Code section 48907 is constitutional; but the district's enabling regulation must be revised. Before purporting to impose a prior restraint on an official school publication in the future, the district should promulgate a proper regulation pursuant to the statutory mandate of Education Code section 48907 in light of the views expressed above. No further action is required in this matter, however: Whether this particular edition of the school newspaper should be published has been mooted by the passage of time, Leeb has not sought to challenge the district's finding that the "Girls of Rancho" article was defamatory on the merits, and he was not harmed by the district's defective regulation.

Judgment affirmed.

Wallin, J., and Trotter, J.,* concurred.

---

* Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.