[No. G006130. Fourth Dist., Div. Three. Dec. 22, 1989.]

RICHARD T. LONG, Plaintiff and Respondent, v.
LINDA VALENTINO et al., Defendants and Appellants.

**COUNSEL**

Meir J. Westreich, Manes & Watson and Hugh R. Manes for Defendants and Appellants.

Stevenson, Epstein & DePasquale and Jeffrey M. Epstein for Plaintiff and Respondent.

## OPINION

**CROSBY, J.**—This is a novel case, a successful civil rights action brought by a police officer, Richard T. Long, against a chapter of the American Civil Liberties Union, a conference participant who spoke on the topic of police espionage at political meetings, and an ACLU attorney.[1] As the issues are framed by defendants Linda Valentino and Rees Lloyd, essentially three questions are presented: (1) Can the Unruh Civil Rights Act (Civ. Code, § 51 et seq.) be violated by First Amendment protected speech? (2) Can private persons be held accountable for a violation of the act based on the use of words alone directed toward a police officer acting in an official capacity? And (3) is it lawful for government agents to attend public political events to gather information concerning the speakers or the organization involved?[2]

■ The short answer to the first question is, the First Amendment does not shield a speaker who uses words alone to violate the Unruh Act, although the speech itself may not be the object of prior restraint (a problem not presented on this record). The second issue requires a qualified affirmative response in the context of this case. The third cannot be answered with any rule of universal application, and we make no effort to address it on the merits. Defendants did not seek relief on that basis via cross-complaint, nor did they assert Long's conduct as an affirmative defense in their answer. ■ Moreover, we will hold that a violation of the Unruh Act cannot be defended on the basis that it was an allegedly justifiable response to another's transgression of the act. The law affords the means to prevent and redress alleged civil rights abuses by public officers and agencies; self-help amounting to a retaliation in kind is not one of them.[3]

---

[1] The ACLU has since made its peace with Long and is no longer a party. The irony in this situation is obvious and brings to mind the words of the late singer and songwriter Jim Croce: "Sometimes you eat the bear, and sometimes the bear eats you."

[2] Other issues are raised but are either mooted by our discussion or subsumed in the resolution of the three major topics noted. There is no contention that the damages or attorneys fees assessed were excessive. (The judgment awarded $4,601.65 in damages against Valentino and $46,016.51 as to Lloyd.) We express no view on those matters accordingly.

[3] Use of self-defense against an assault by a government official acting under color of authority, e.g., by a victim of an attempted rape, would still be permissible, of course. It is obviously not a violation of the Unruh Act to resist a criminal attack.

We will conclude the judgment against Lloyd must be affirmed. The verdict must be set aside with respect to Valentino, however, because the tenuous connection between her words and Lloyd's reaction is insufficient as a matter of constitutional law to affix liability: The judgment against her amounts to an overbroad application of the Unruh Act and conflicts with federal and state constitutional guaranties of freedom of expression.

I

Long was the Newport Beach Police Department Community Programs Officer. In that role he was the official police liaison with the community and the press and reported directly to the chief of police. He attended and organized various meetings in the city. In the fall of 1980, he read of an ACLU Legislative Conference in which police practices would be a topic. The meeting was advertised as open to the public at a public facility, Newport Harbor High School, on October 11, 1980.

With the knowledge and approval of the police chief, Long appeared on that date. Attired in mufti, his usual dress when attending community events, Long paid the modest admission and lunch fees and indicated an interest in seminars dealing with the federal criminal code and police practices. He was given a name tag which he wore during the conference. Long did not sign the register, which did not ask for attendees' occupations, because, as he explained at trial, he was unaware of it. Long said he would have enrolled had his attention been drawn to the register. There was evidence others failed to sign in as well. No warning of any kind was given that representatives of government or law enforcement agencies were not welcome at the conference. (Ironically, one police chief, who did not attend, was an invited guest.)

Long took extensive notes and also, surreptitiously it appears, tape-recorded a speech by the president of the Orange County chapter. Sometime during the morning, ACLU staff attorney Ronald Talmo recognized plaintiff from a recent television appearance as a police spokesman. Talmo asked the officer his reason for attending the conference, and Long told him he was there to hear any criticism that might be made of his department and to learn of the ACLU's perception of Newport Beach police. Talmo did not suggest Long was not welcome, but he notified Meir Westreich of the officer's presence.

Westreich was an ACLU board member and chair of the conference. He was also a witness and counsel for Valentino in the trial court and continues to represent her on appeal. Talmo and Westreich discussed the matter briefly. Apparently by happenstance, Westreich then met sequentially with

Valentino, Lloyd, and Ramona Ripston, Executive Director of both the ACLU and the ACLU Foundation, concerning what, if anything, should be done about Long's attendance. Westreich suggested to Valentino that she reveal the officer's presence during her part of a seminar on the subject of police surveillance of public meetings. The idea, according to Westreich and Valentino, was to warn the participants that a police officer was among them and to obtain an explanation of purpose from Long himself.

Valentino was an employee of the "Friends Service Committee" and coordinator of its "Police Surveillance Project." At that time she was a plaintiff in an action against the Los Angeles Police Department involving the allegedly unlawful monitoring of political events. Community relations officers were accused of participation in that activity. During her presentation on the subject of police surveillance of public meetings and discussion of the Los Angeles litigation, Valentino turned to Long and, according to him, stated accusatorially, "Would you care to comment on that Officer Long?" At trial she denied knowing which member of the audience he was, however, and suggested it was pure coincidence that she might have looked in Long's direction when she issued her challenge.

Some 20 minutes later, during a question and answer session after Valentino and the next speaker on the program finished, ACLU staff attorney Lloyd rose and asked Valentino whether a police officer was in attendance. She replied she was not sure but had been told a Newport Beach policeman named Richard Long was in the audience. Lloyd then demanded that Long identify himself. Long did so; and Lloyd said, "I want you outside. I'd like to discuss some of the principles of the ACLU with you." Lloyd started to walk out, but Long remained in his seat. Lloyd then approached the officer and said, "I want you outside right now." His tone of voice "was pretty malevolent," according to Long. "He wasn't being nice about it." He then put a finger in Long's face and ordered him out again. Long refused, stating he did not have to leave and had done nothing wrong. The impasse continued in this vein until Lloyd threatened to slap the officer or slap him with a lawsuit. The sentence was not completed apparently, but Long's testimony tended to support Lloyd's version that the latter was the import of the statement. Nonetheless, Lloyd's behavior was such that Long felt as if he were being invited outside to fight. Long rose and announced he would leave if allowed to speak first.

Officer Long then told the attendees he was not there to spy on them. He had a legitimate interest in knowing of any concerns they might have with respect to his department. Long would communicate what he learned to the police chief so "that we could do something about these problems." He added he was not attempting to interfere with their rights or freedom of

speech but his own rights were being violated by being ejected. Long denied his notes were destined for police intelligence files, although he would make them available to the department if asked. He explained he was off duty and on his own time. (He would later withdraw that claim and admit the opposite was true.)

Long, who testified the incident made him "extremely upset," left the room. Outside, two elderly ladies apologized to him; and Lloyd, now "cordial and polite as could be," came up and stated, "now that you've identified yourself and everybody knows what your intentions are[,] come on back inside. You know, you can come back inside." Long refused, however, "[b]ecause I was embarrassed, I was humiliated by these people. You got all these people sitting there looking at you like you done something wrong."

Three theories were advanced at trial against the ACLU, Lloyd, and Valentino: negligent and intentional infliction of emotional distress and unlawful discrimination under the Unruh Civil Rights Act. The court directed verdicts for defendants on the negligent infliction of emotional distress cause of action and that component of the Unruh Civil Rights Act claim grounded on intimidation by threat of violence (Civ. Code, § 51.7). The court also determined there was insufficient evidence to submit the intentional infliction of emotional distress cause of action against the ACLU and Valentino to the jury; Long has not cross-appealed on those points. The issues of whether Lloyd intentionally and with malice subjected plaintiff to emotional distress and whether all three defendants unlawfully discriminated against Long based on his occupation as a peace officer were submitted to the jury. Long prevailed on the latter theory against the ACLU, Lloyd, and Valentino.

## II

At the outset it is worth noting that Valentino and Lloyd do *not* argue the evidence is insufficient to support the jury's factual determination that Long was indeed ejected from the conference, nor do they contend *physical* expulsion from a public meeting based on an individual's occupation is permissible under the Unruh Act. They do claim a "government agent" may be verbally ejected, however, without violating the law.

We consider the case against Valentino first because it is easily resolved. Surprisingly, she does not directly attack the sufficiency of the evidence to support the verdict. The matter would be even easier to dispose of if she had. Nevertheless, she is correct that the First Amendment of the United States Constitution and article I, section 2, subdivision (a) of the Constitution of California protected the words she uttered and the Unruh

Act would infringe on the constitutional guarantees of freedom of speech if its net could be so broadly cast. We will examine in the section following whether speech clearly calculated to effect a discriminatory expulsion of an individual from a public meeting because of his or her trade or occupation retains its First Amendment protection in the context of a civil suit for damages, but that is unnecessary with respect to the case against Valentino.

The application of the Unruh Act to her words runs afoul of constitutional overbreadth restrictions: At the most she merely requested Long to identify himself. Her words taken literally only invited him to comment. When he chose to do neither, she concluded her presentation and sat down. Lloyd asked Valentino about her revelation well before he ejected Long. She simply gave a neutral and factually accurate reply. Her words were protected by the First Amendment.

In a special verdict the jury answered the following question in the affirmative: "Did Linda Valentino eject, or aid, incite or conspire in ejecting[ ] Officer Long from the police practices seminar?" Indisputably, she did not eject the officer. And, beyond speculation and conjecture, there is only the most meager circumstantial evidence to sponsor the notion that she acted in concert or conspired with Lloyd or anyone else to precipitate his departure.[4] The only reasonable basis for the jury finding is that she incited the ejection.

Although Valentino does not attack that finding head on, she must prevail nonetheless. ■ Where an invasion of a constitutionally protected right is alleged, in this case the First Amendment right to free speech, we must undertake an independent review of the entire record. (*Cox* v. *Louisiana* (1965) 379 U.S. 536, 545, fn. 8 [13 L.Ed.2d 471, 478, 85 S.Ct. 453].)

---

[4] We respectfully disagree with the premises of our colleague's dissent regarding the disposition of Valentino's appeal. As explained below, to the extent she might have expected others to violate the Unruh Act by ejecting Long after she revealed his presence, we believe her speech was protected because there could have been no reason to expect a *violent* reaction against the officer and nothing less could suffice to avoid conflict with the First Amendment. We also reject the notion that she acted as part of a conspiracy because there was no direct evidence of that.

In an ordinary conspiracy case, Valentino's mention of Long's name and occupation might be taken as circumstantial evidence of her participation in a plot to cause his ejection; but we agree with these words of Justice Kaus (although they were not adopted by the other members of the panel): "Therefore, unless one is prepared to say that anyone who organizes a demonstration by high school students assumes the risk of their misbehavior, it must be that the First Amendment prohibits conspiracy prosecutions in this area where the People's case that the demonstrations, as planned, involved illegal means, rests entirely on circumstantial evidence." (*Castro* v. *Superior Court* (1970) 9 Cal.App.3d 675, 694 [88 Cal.Rptr. 500].) There being no direct evidence of Valentino's participation in a conspiracy to eject Long, this theory was unavailable to plaintiff, even if the jury adopted it.

■    That examination yields but one conclusion: Valentino is entitled to judgment as a matter of law. Her words no more displayed a desire to incite a violation of the Unruh Act than wearing a jacket bearing the words "Fuck the Draft" demonstrated "an intent to incite disobedience to or disruption of the draft . . . ." (*Cohen* v. *California* (1971) 403 U.S. 15, 18 [29 L.Ed.2d 284, 290, 91 S.Ct. 1780].)

Even assuming we could sustain a finding that she intended to, and did, incite Lloyd's reaction, however, mere incitement of another to commit a nonviolent civil rights violation may not be punished. A speaker may freely attack institutions, trades, occupations, groups, races, and ethnic majorities or minorities in this country in hopes that others will discriminate against them. Those who implement such abuses in response to an obnoxious exhortation may be punished under appropriate statutes. But one of the prices we pay to retain our liberty of expression is that the speaker may not, unless the speech is obscene or threatens to produce an immediate violent reaction.

In *Chaplinsky* v. *New Hampshire* (1942) 315 U.S. 568 [86 L.Ed. 1031, 62 S.Ct. 766], the Supreme Court agreed " 'face-to-face words plainly likely to cause a breach of the peace by the addressee' " do not enjoy constitutional protection. (*Id.*, at p. 573 [86 L.Ed.2d at p. 1036].) Violent reaction could not have been expected here, of course, since the addressee was a police officer. (See *Houston* v. *Hill* (1987) 482 U.S. 451, 462 [96 L.Ed.2d 398, 412, 107 S.Ct. 2502]; *Lewis* v. *City of New Orleans* (1974) 415 U.S. 130, 135 [39 L.Ed.2d 214, 220, 94 S.Ct. 970] (conc. opn. of Powell, J.).) Moreover, the incitement in this case was allegedly to violate the civil rights of another, not to provoke violence. Evils less than the immediate incitement of a violent reaction will rarely justify punishing speech. (See *Schenck* v. *United States* (1919) 249 U.S. 47 [63 L.Ed. 470, 39 S.Ct. 247].)

In *Terminiello* v. *Chicago* (1949) 337 U.S. 1 [93 L.Ed. 1131, 69 S.Ct. 894], a speaker who denounced Jews and Blacks was prosecuted under a municipal ordinance prohibiting breaches of the peace. The trial judge instructed that speech which "stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance" would violate the ordinance. (*Id.*, at p. 3 [93 L.Ed. at p. 1134].) The Supreme Court struck down the ordinance, noting, "[A] function of free speech . . . is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. . . . [T]he alternative would lead to standardization of ideas either by legislatures, courts, or dominant

political or community groups." (*Id.*, at pp. 4-5 [93 L.Ed. at p. 1134].) By contrast, Valentino's words were comparatively mild.

In *Feiner* v. *New York* (1951) 340 U.S. 315 [95 L.Ed. 295, 71 S.Ct. 303], the Supreme Court did apply *Chaplinsky* to uphold an arrest where an inflammatory speech verged on the provocation of a violent reaction; but in *Edwards* v. *South Carolina* (1963) 372 U.S. 229 [9 L.Ed.2d 697, 83 S.Ct. 680], the high court seemingly retreated from even that position. There, civil rights demonstrators were asked to leave the grounds of the South Carolina Legislature because unsympathetic onlookers were becoming increasingly agitated. Nonetheless, the court refused to apply the "hostile crowd" exception because of the potential chilling effect on such protected activities. (See also *Cox* v. *Louisiana, supra,* 379 U.S. 536.)

To reiterate: All Valentino did was ask a policeman to identify himself and later reveal his presence by name to the assemblage. She did not eject him or even ask him to leave. Nothing in the record suggests she sought his departure, and at trial she specifically denied an intention to provoke his eviction from the meeting. The only evidence is that she wished to inform the audience of his presence and learn his purpose. To be sure, she believed it was improper for police to attend such events; but the state may not constitutionally impinge upon her right to express that view to a policeman, an audience, or an audience containing a policeman. Nor may the state deny her the right to identify a policeman in a peaceful public gathering or to ask the officer to comment or identify himself. (*Houston* v. *Hill, supra,* 482 U.S. 451.) Although she did not, she could have asked him to leave or expressed the opinion that he should.

## III

Lloyd went considerably farther, however. ■ We must reject his sweeping claim that a violation of the Unruh Act accomplished by words alone is not actionable. It is true, as defendants argue, that speech is generally protected by the First Amendment, even if it is intended to interfere with the performance of an officer's duty, provided no physical interference results. (*Houston* v. *Hill, supra,* 482 U.S. at p. 469 [96 L.Ed.2d at p. 417].) Here, the words did accomplish a physical event, Long's ejection; and, although this is not a criminal action, analogy to criminal law is useful. Speech may be subject to criminal prosecution in a variety of contexts, e.g., attempted robbery, conspiracy, contempt of court, extortion, fraud, offers to sell narcotics, solicitation of various sorts, treason, and so on, provided only that it is accompanied by the appropriate mens rea. But the same words spoken without that mens rea, as in a play or movie, for example, enjoy complete constitutional protection.

The same is true in the context of the Unruh Act, which can be violated in a number of ways by words alone. If the speech is meant to, and does, offend the law, utterance of the words themselves may be protected; but the speaker is subject to the consequences. This state's version of the First Amendment, which is even more liberally construed (see *Leeb* v. *DeLong* (1988) 198 Cal.App.3d 47, 52, fn. 1 [243 Cal.Rptr. 494]), literally says just that: "Every person may freely speak, write and publish his or her sentiments on all subjects, *being responsible for the abuse of this right.* A law may not restrain or abridge liberty of speech or press." (Cal. Const., art. I, § 2, subd. (a), italics added.)

We would be shocked to hear the ACLU adopt the position that the words, "I won't rent to you because you are a (insert racial expletive)," are constitutionally protected in the sense that a racially based refusal to rent to a member of a minority must go unredressed merely because it was communicated directly to the victim. And defendants' attorneys correctly agreed at oral argument that an announcement such as "You can't eat in my diner because you are a lawyer, bricklayer, female, or Indian chief" would be actionable under the Unruh Act, although words alone were the means employed to effect unlawful discrimination. (See *Koire* v. *Metro Car Wash* (1985) 40 Cal.3d 24, 35-36 [219 Cal.Rptr. 133, 707 P.2d 195]; *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721, 726 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161].) Nevertheless, defendants do urge an exception for on-duty police officers, a proposition we consider in the following section.

Lloyd indisputably caused the ejection of Officer Long in contravention of the Unruh Act. That he accomplished this by words alone is immaterial for the same reason we do not literally punish a bandit for mere use of the words, "Stick 'em up, you moron." We punish him for the *act* of attempting to take the property of another by force and fear. It is of no moment that language was the vehicle to the goal in this and our hypothetical case. Physical force alone could have been employed in either; and the words, while they may have contained a kernel of expression in each instance (e.g., "you moron"), amount to conduct designed to accomplish a direct violation of the law and not primarily a means of conveying an idea or point of view.

Long was not asked to leave; he was told he must do so. In our criminal law hypothetical, that is the difference between panhandling and attempted robbery. Words alone are not being punished in this case. The same speech in jest or on stage or screen has complete protection because it is just that: speech. Lloyd's words were considerably different, however. The jury was quite correctly instructed that if they were merely intended as free expression, as opposed to accomplishing Long's expulsion from the meeting in violation of the Unruh Act, it should find for Lloyd. The issue was resolved

against him, and the jury could hardly have reached a contrary verdict on this record.

## IV

■ Finally, we turn to the core of the defense argument, that on-duty police officers are not subject to Unruh Act protection when they attend public political meetings for the purpose of gathering information concerning individuals or organizations. Before embarking on our analysis, we offer this caveat: We do not condone the practice of spying on and infiltrating political organizations and maintaining dossiers on public and private figures who are not suspected of criminal activity or of being a threat to national security by organizations who are supposed to enforce the law. This court shares defendants' revulsion of such abuses of the executive power. And we are mindful that while Long spoke of a laudable purpose, improved police-community relations, the fact is he took copious notes and used a clandestine tape recorder even though, by all accounts, his department was not mentioned until Valentino disclosed his presence.

At the same time, however, police officers are literally on duty 24 hours a day under California law. (See *People* v. *Corey* (1978) 21 Cal.3d 738, 746 [147 Cal.Rptr. 639, 581 P.2d 644]; *People* v. *Derby* (1960) 177 Cal.App.2d 626, 631 [2 Cal.Rptr. 401]; Pen. Code, §§ 142, 830.1.) And they are as much entitled to the protections of the Unruh Act as any other citizen. They may not be refused service in a restaurant, denied an apartment, or ejected from a public meeting merely because of their occupation, whether working a shift or on vacation. We find defendants' position on this point, at least as articulated at oral argument, to be as reprehensible as the police abuses decried above. Police officers as individuals have rights, too, and can bring actions for violations of those rights even though their injury has arisen in some way related to the performance of their duties. (*City of Long Beach* v. *Bozek* (1982) 31 Cal.3d 527, 538, fn. 9 [183 Cal.Rptr. 86, 645 P.2d 137].)

A somewhat different problem is presented by the contention that a police officer on a mission to spy on individuals and organizations holding a public meeting may be excluded, however. We agree that is not quite the same as refusing to serve a beat cop a cup of coffee because the owner does not like police. The fulcrum of defendants' argument is *White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222]. There, the California Supreme Court held a complaint alleging covert infiltration of classrooms on the UCLA campus by the Los Angeles Police Department for the purpose of compiling intelligence and dossiers on students and professors

stated causes of action for violations of freedom of speech and assembly, as well as the state constitutional right of privacy.

The court leaned heavily on the concept of academic freedom in reaching its conclusions, however; and that is a major distinction between our facts and those of *White*. Participants in this public conference should have had very different expectations than the students and faculty of UCLA in the classroom. Well-known politicians attended and spoke at this event. Press coverage was probable and may have been sought and obtained, for all we know. The ACLU itself advertised the conference in the press as open to the public without restriction. A classroom at UCLA is not a public forum; this meeting was.

Although defendants ask us to resolve the lawfulness of Long's conduct now, we must decline.[5] They included exactly no affirmative defenses in their answer, nor did they cross-complain against Long or the city to assert a violation of *their* civil rights. Had they cross-complained, we would have a very different case, perhaps, and one much more similar to *White*. But Lloyd did not resort to the legal process before or after he violated Long's rights under the Unruh Act. He chose to use self-help at the outset and has yet to properly tender the *White* issue.

Even if applicable to the present facts, *White* cannot excuse Lloyd's conduct. He is no more entitled to relief based on Long's allegedly improper activities than would be the owner of a diner, who after being denied an apartment because of her race, sex, or occupation, refused service to the offending landlord for the identical reason. Neither violation excuses the other. We have found no authority on this precise point and rely on a basic principle of our jurisprudence: Two wrongs do not make a right. Assuming Long was engaged in improper surveillance at the instance of his department, the remedy selected by Lloyd cannot be condoned.

Defendants have also attempted to draw a distinction between officers merely on duty and those acting in an official capacity and have attempted to couple that argument with the strained contention that Lloyd's behavior was somehow protected by the constitutional right to petition the government. We are not impressed. (See *City of Long Beach* v. *Bozek, supra*, 31 Cal.3d at p. 538, fn. 9.) If the question was whether the City of Newport Beach could maintain an Unruh Act complaint in its own name based on Long's treatment, we would agree with the defendants. But while an officer acting in an official capacity does represent an institution, he is still a

---

[5]Defendants did belatedly raise *White* in their trial brief. Assuming that was sufficient, *White* is so thoroughly distinguishable from the present situation, both legally and factually, it is essentially irrelevant.

human being. He can be yelled at, screamed at, *asked* to leave. Free speech can be exercised to the fullest in denouncing his presence, and that he must endure. But he may not be the object of a discriminatory ejection from a public meeting.

A car rental agency cannot refuse to rent an automobile to an officer because his purpose is to examine it for possible violations of safety standards. A restaurant cannot refuse service to a health inspector who is not hungry but does wish to check the food for flies. And a transportation company cannot refuse the fare of a civil rights investigator who wishes to observe whether minorities are being required to ride in the back of the bus. These are examples of discrimination based on employment. It is of no moment that a government agent is acting for official as opposed to personal reasons when he becomes the object of unlawful discrimination.

Ordinarily, the damages might not amount to much in such cases; although the agent's mission was affected, no personal insult was inflicted. But, as here, that will not always be the case. For example, Long could have been privately ejected under circumstances that did not cause a stressful and humiliating departure. His damages would have been minimal or nonexistent. But to return to our hypotheticals, he was not simply refused service; he was given the bum's rush as well. That conduct was not protected by the First Amendment or article I, section 2, subdivision (a) of the state Constitution.

The judgment is affirmed with respect to defendant Lloyd and reversed as to defendant Valentino with directions to enter judgment in her favor. Valentino shall receive costs on appeal. Long is entitled to costs and attorneys fees expended to defend Lloyd's portion of the appeal as determined by the superior court upon return of the remittitur.

Wallin, J., concurred.

**SCOVILLE, P. J.,** Concurring and Dissenting.—I concur in the majority opinion insofar as it holds that speech alone may violate the Unruh Civil Rights Act. But I dissent from that part of the opinion which holds Valentino did not violate the Act because her speech was "neutral and factually accurate" and thus protected by the First Amendment. (Maj. opn., *ante*, p. 1294.)

The jury expressly found that Valentino ejected, or aided, incited, or conspired in ejecting Long from the public seminar. A review of the record supports that finding. It is undisputed that Valentino was told prior to giving her speech on the subject of police surveillance of public meetings

that there was a local police officer in attendance. She testified that American Civil Liberties Union (ACLU) representative Meir Westreich told her she "should make it known" to the workshop that there might be an officer present and "see what happened." She agreed to do so, telling those in attendance "that meetings such as the one we were in at that moment were frequently targets of undercover officers that came and took notes and tape recorded and took down what people said and put them in files." She then looked out over the audience and asked, "Would you care to comment on that, Officer Long?" Not surprisingly, there was no response. When she was questioned later during the question-and-answer session whether a policeman was present, she replied that she had been led to believe an officer was in the audience. Long was asked to identify himself. When he did, Valentino watched silently as Lloyd, an ACLU attorney, verbally ejected him from the room.

The majority characterizes Valentino's question as a mere request for Long to identify himself and an invitation for him to comment. That was her defense. It was also a defense roundly rejected by the jury. The majority then characterizes her statement as to Long's presence as simply a factually true reply. Speech alone is, as the majority points out, generally protected by the First Amendment. But speech which serves to accomplish a physical event, such as Long's ejection from the workshop, is not. The issue then is whether Valentino's speech was protected, or whether it effected a violation of the Unruh Act.

Viewed in the abstract, asking seminar participants if they would like to comment on the issues, or stating that a certain person is in the audience, is, without more, protected speech. However, constitutional rights cannot be judged in the abstract; they must be judged in context. Accordingly, whether Valentino's speech was protected must be viewed in light of the totality of the circumstances. And I refuse to put blinders on to what was happening here.

Valentino asked Long if he would like to comment on the issues in order to single him out in front of the other participants as a police officer. Moreover, the question was asked at the urging of an ACLU representative and with the intent of seeing what would happen. What happened probably did not come as much of a surprise to either Valentino or the ACLU representative who prompted her. Identifying Long as a police officer right after telling the seminar participants the police frequently conduct surveillance of these meetings was likely to lead to but one conclusion: Long was a police surveillant. It was also likely to lead to Long's ejection. Either he would be forcibly ejected because he was there in his official capacity, or he would be humiliated into leaving even though he was there in his personal

capacity. Indeed, after he assured Lloyd he was there in his personal capacity, Long felt too humiliated and distressed to go back to the workshop because the emotions of the participants ran so high.

Contrary to the majority opinion there is substantial evidence from which the jury could have concluded Valentino ejected Long from the workshop or conspired to eject him. "As long as two or more persons agree to perform a wrongful act, the law places civil liability for the resulting damage on *all* of them, regardless of whether they actually commit the tort themselves. [Citation.]" (*Wyatt* v. *Union Mortgage Co.* (1979) 24 Cal.3d 773, 784 [157 Cal.Rptr. 392, 598 P.2d 45], italics in original.) "Furthermore, the requisite concurrence and knowledge ' " 'may be inferred from the nature of the acts done, the relation of the parties . . . and other circumstances.' " ' [Citation.]" (*Id.* at p. 785.)

I would affirm the entire judgment.

A petition for a rehearing was denied January 19, 1990, and the petitions of respondent and appellants for review by the Supreme Court were denied April 19, 1990.