[No. B221103. Second Dist., Div. One. June 29, 2011.]

RONALD H. SEMLER, Plaintiff and Appellant, v. GENERAL ELECTRIC CAPITAL CORPORATION, Defendant and Respondent.

## COUNSEL

Law Office of Kathryn M. Davis and Kathryn M. Davis for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, Alan H. Martin and Scott B. Lieberman for Defendant and Respondent.

## OPINION

**MALLANO, P. J.**—This appeal raises the question of whether a commercial lending institution, which is also an equity investor in a borrower's venture, violated the Unruh Civil Rights Act (sometimes the Act) (Civ. Code, § 51) by declining to make a loan to a limited liability company because its managing member included a felon who had conspired to falsify customs documents and sell munitions to Syria.

We conclude that being a felon is not a personal characteristic similar to those enumerated in the Act; the lending institution had legitimate business reasons justifying its decision—the repayment of the loan and making a return on its equity investment; and the potential consequences of allowing

such a claim would improperly involve the courts in second-guessing a lending institution's expertise in determining loan and investment criteria.

# I

## BACKGROUND

The facts in this appeal are taken from the allegations of the complaint, which we accept as true. (See *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 8, fn. 3 [32 Cal.Rptr.2d 244, 876 P.2d 1043].)

### A. *Complaint*

The complaint, filed on May 13, 2009, alleged as follows. On or about November 2, 2005, plaintiff Ronald H. Semler, in his capacity as trustee of the Semler family trust, was invited pursuant to a private placement memorandum to invest in ARI Overland Management, LLC (Overland Management), a limited liability company. Overland Management was the managing member of another limited liability company, ARI Overland, LLC (ARI Overland), which was formed to purchase real property located in San Dimas, California. Adler Realty Investment, Inc. (Adler Realty), was the managing member of Overland Management.

There were 10.58 "membership units" available for investment in Overland Management at a cost of $50,000 per unit. Semler intended to purchase five units, paying $250,000. According to the complaint, "[T]he investment [was] set to close on November 10, 2005." Semler was to be a "passive" investor, with no management authority and no personal liability to repay the loan. His investment was to be paid "up front."

The private placement memorandum stated that defendant General Electric Capital Corporation (GE Capital), acting through its wholly owned subsidiary, GEBAM, Inc., had agreed to provide a mezzanine loan to ARI Overland in the approximate amount of $6.58 million. As alleged, by making a mezzanine loan, GE Capital not only acted as a lender but also became an "equity participant" by making an "equity investment" in ARI Overland.

On or about November 11, 2005, GE Capital informed Adler Realty that it would provide the requested financing but would not accept Semler as a

member of Overland Management because he had been convicted of felonies in 1988. In response to GE Capital's demand, ARI Overland excluded Semler as a member of Overland Management and did not allow him to invest in the venture. Thereafter, GE Capital made the loan to, and invested in, ARI Overland.[1]

The complaint described Semler's felonies as "technical tax violations, as well as export violations committed by a corporation of which, at the time the violations occurred, [Semler] was an employee, officer and shareholder."

After soliciting the parties' views on the issue (see Evid. Code, §§ 459, 455), we decided to take judicial notice of the official federal court records concerning Semler's convictions. Those records disclosed that, by way of a superseding four-count information filed in the United States District Court for the Central District of California on February 10, 1988, Semler was charged with (1) a conspiracy (see 18 U.S.C. § 371) allegedly involving (2) the knowing falsification of customs documents regarding the exportation of "Hughes model 500 E helicopters" (see 18 U.S.C. § 1001), (3) the "export[ation] from the United States to Syria [of] components, parts and accessories specifically designed for use, and currently used with, AN/PRC-77 military radios, articles on the U.S. Munitions List, without first having obtained the required license . . . and written approval from the Department of State" (see 22 U.S.C. § 2778(c); 22 C.F.R. §§ 121.1–121.16 (2011)), and (4) willfully impeding the functions of the Internal Revenue Service to assess and collect taxes. Pursuant to a plea agreement, filed in federal court on February 10, 1988, Semler agreed to plead guilty to the charges. In accordance with a "Judgment and Probation/Commitment Order," dated February 10, 1988, Semler received a sentence of three years on three counts and two years on the remaining count, all to run concurrently. He was also ordered to pay $10,000 per count for a total of $40,000. The federal court recommended that Semler serve his sentence at the Lompoc prison camp at Lompoc, California.

Semler's complaint asserted one cause of action, for violation of the Act, identified as "Civ. Code, § 51, et. seq." The cause of action alleged that GE Capital, acting through GEBAM, Inc., had violated the Act by declining to

---

[1] The complaint, which is not a model of clarity, suggests that Overland Management was the borrower. In his appellate briefs, Semler states that ARI Overland was the borrower and relies on that assertion in his legal analysis. We treat ARI Overland as the borrower.

make a loan to ARI Overland because Semler, who wanted to invest in, and become a member of, Overland Management, was a felon.

B. *Demurrer*

GE Capital filed a demurrer, contending the action was barred by the two-year statute of limitations for personal injuries set forth in section 335.1 of the Code of Civil Procedure and, alternatively, the complaint failed to allege a violation of the Act.

In his opposition, Semler argued that a three-year limitations period applied (see Code Civ. Proc., § 338, subd. (a)) because his claim was not recognized at common law but was created by statute, that is, the Act.[2] Semler further argued that the Act protects felons from arbitrary discrimination and that GE Capital's decision to oust him from membership in Overland Management as a condition of making a loan and an equity investment in the venture served no legitimate business purpose.

The demurrer was heard on September 17, 2009. In a written tentative ruling, the trial court concluded that the action was barred by the two-year statute of limitations for personal injuries (Code Civ. Proc., § 335.1). The tentative ruling did not address whether the complaint alleged a violation of the Act. After argument, the trial court adopted its tentative ruling as its final ruling. On October 16, 2009, an order of dismissal was entered. Semler appealed.

## II

## DISCUSSION

"In reviewing the ruling on a demurrer, 'we are guided by long-settled rules. "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. . . . We also consider matters which may be judicially noticed." . . . When a demurrer is sustained [without leave to amend], we determine whether the complaint states facts sufficient to constitute a cause of action.' " (*August Entertainment, Inc. v. Philadelphia Indemnity Ins. Co.* (2007) 146 Cal.App.4th 565, 573 [52 Cal.Rptr.3d 908].)

On appeal, the parties debate whether the complaint is barred by the statute of limitations and whether GE Capital violated the Act. As the parties

---

[2] Semler filed an initial complaint on November 6, 2008, but dismissed it pursuant to an agreement between the parties that the applicable statute of limitations would be tolled from February 19, 2009, through August 19, 2009.

acknowledge, the courts are divided as to which statute of limitations governs a claim under the Act: the two-year limitations period for personal injuries (Code Civ. Proc., § 335.1) or the three-year limitations period for a liability created by statute (*id.*, § 338, subd. (a)). (See *Gatto v. County of Sonoma* (2002) 98 Cal.App.4th 744, 754–760 [120 Cal.Rptr.2d 550]; *Stamps v. Superior Court* (2006) 136 Cal.App.4th 1441, 1449, fn. 8 [39 Cal.Rptr.3d 706].) We see no need to contribute to the ongoing discourse as to the appropriate statute of limitations. Instead, we address whether the complaint alleged a violation of the Act. "Act issues are often decided on demurrer or motion for summary judgment when the business practice appears to be valid on its face as bearing a reasonable relation to appropriate commercial objectives for a public enterprise." (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1509 [82 Cal.Rptr.2d 368].) That is the situation here.

■ Applying the three-part analysis adopted in *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142 [278 Cal.Rptr. 614, 805 P.2d 873] (*Harris*), we conclude that being a felon is not a personal characteristic similar to those enumerated in the Act; GE Capital had legitimate business reasons justifying its decision—the repayment of the loan and making a return on its equity investment; and the potential consequences of allowing Semler's claim would improperly involve the courts in second-guessing a lending institution's expertise in determining loan and investment criteria. In sum, GE Capital, acting through GEBAM, Inc., could permissibly deny a loan to, and decline to invest in, a limited liability company where a member of its management was a felon. The trial court therefore properly dismissed the case on demurrer.

## A. Unruh Civil Rights Act

"[E]arly common law decisions regarded certain enterprises as 'public' or 'common' callings, or, to use a later phrase, 'affected with a public interest.' These undertakings 'held themselves out' as providing a particular product or service to the community. . . . The common law attached to these enterprises 'certain obligations, including—at various stages of doctrinal development— the duty to serve all customers on reasonable terms without discrimination and the duty to provide the kind of product or service reasonably to be expected from their economic role. Such occupations as blacksmith, food seller, veterinarian, and tailor, as well as those of common carrier and innkeeper were probably included in that category.' . . .

"The California Legislature, in 1897, enacted these common law doctrines into the statutory predecessor of the present Unruh Civil Rights Act. . . . The 1897 act provided: 'That all citizens within the jurisdiction of this State shall be entitled to the full and equal accommodations, advantages, facilities,

privileges of inns, restaurants, hotels, eating-houses, barber-shops, bath-houses, theaters, skating-rinks, and all other places of public accommodation or amusement, subject only to the conditions and limitations established by law and applicable alike to all citizens.' (Stats. 1897, ch. 108, p. 137, § 1.) A 1919 amendment broadened the act to encompass public conveyances. (Stats. 1919, ch. 210, p. 309, § 1.) In 1923 the Legislature extended the act's coverage to 'places where ice cream or soft drinks of any kind are sold for consumption on the premises. . . .' (Stats. 1923, ch. 235, p. 485, § 1.) [¶] . . . [¶]

"In the late 1950's, . . . the Legislature became concerned that Courts of Appeal, narrowly defining the kinds of businesses that afforded public accommodation, were improperly curtailing the scope of the public accommodations provisions. . . . Accordingly, [in 1959,] the Legislature, enacting the Unruh Act, modified the mandate that 'All citizens . . . are entitled to the full and equal accommodations' and broadened its scope so that it read thereafter: 'All citizens . . . are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations . . . in all business establishments of every kind whatsoever . . . .' " (*In re Cox* (1970) 3 Cal.3d 205, 212–214 [90 Cal.Rptr. 24, 474 P.2d 992], citations & fn. omitted (*Cox*); see Stats. 1959, ch. 1866, § 1, p. 4424.) In 1961, the Legislature substituted "all persons" for "all citizens." (Stats. 1961, ch. 1187, § 1, p. 2920.)

In *Cox, supra*, 3 Cal.3d 205, the high court held that "[t]he nature of the 1959 amendments, the past judicial interpretation of the act, and the history of legislative action that extended the statutes' scope, indicate that identification of particular bases of discrimination—color, race, religion, ancestry, and national origin—added by the 1959 amendment, is illustrative rather than restrictive. . . . Although the legislation has been invoked primarily by persons alleging discrimination on racial grounds, its language and its history compel the conclusion that the Legislature intended to prohibit all arbitrary discrimination by business establishments." (*Cox*, at p. 216, citation omitted.) The court went on to hold that, in light of the facts of the case, the Act protected an individual with long hair and "unconventional" attire who had been told to leave a shopping center by a security officer. The Act precluded the shopping center from barring the individual from the premises notwithstanding a city ordinance authorizing the removal of a person from any business property after being instructed to leave. (*Cox*, at pp. 217–218.)

Yet the court commented: "[W]e do not imply that [an] establishment may never insist that a patron leave the premises. Clearly, an entrepreneur need not tolerate customers who damage property, injure others, or otherwise disrupt his business. A business establishment may, of course, promulgate

reasonable deportment regulations that are rationally related to the services performed and the facilities provided." (*Cox, supra*, 3 Cal.3d at p. 217, fn. omitted.)

*Cox* is consistent with two decisions rendered under the predecessor statute to the Act. In *Stoumen v. Reilly* (1951) 37 Cal.2d 713 [234 P.2d 969] (*Stoumen*), the court held that the Board of Equalization could not suspend the liquor license of a restaurant that catered to gay patrons. As the court explained: "Members of the public of lawful age have a right to patronize a public restaurant and bar so long as they are acting properly and are not committing illegal or immoral acts; the proprietor has no right to exclude or eject a patron 'except for good cause,' and if he does so without good cause he is liable in damages. (See Civ. Code, §§ 51, 52.) . . .

"The fact that the [restaurant] was reputed to be a 'hangout' for homosexuals indicates merely that it was a meeting place for such persons. . . . Unlike evidence that an establishment is reputed to be a house of prostitution, which means a place where prostitution is practiced and thus necessarily implies the doing of illegal or immoral acts on the premises, testimony that a restaurant and bar is reputed to be a meeting place for a certain class of persons contains no such implication. Even habitual or regular meetings may be for purely social and harmless purposes, such as the consumption of food and drink, and it is to be presumed that a person is innocent of crime or wrong and that the law has been obeyed." (*Stoumen, supra*, 37 Cal.2d at pp. 716–717, citation omitted.)

Similarly, in *Orloff v. Los Angeles Turf Club* (1951) 36 Cal.2d 734 [227 P.2d 449] (*Orloff*), the court applied Civil Code former section 53, which provided that it was unlawful for the proprietor of any " 'opera-house, theater, melodeon, museum, circus, caravan, race-course, fair or other place of public amusement or entertainment, to refuse admittance to any person over the age of twenty-one years, who presents a ticket of admission acquired by purchase, or who tenders the price thereof for such ticket, and who demands admission to such place. Any person under the influence of liquor, or who is guilty of boisterous conduct, or any person of lewd or immoral character, may be excluded from any such place of amusement.' " (*Orloff*, at p. 736.)

The horse racing board had promulgated regulations stating that "persons guilty of dishonest or corrupt practices, fraudulent acts or other conduct detrimental to racing shall be ruled off all racing enclosures" and had required racetracks to "police the grounds and to eject therefrom known undesirables, touts, persons under suspension or ruled off, persons of lewd or immoral character, and persons guilty of boisterous or disorderly conduct." (*Orloff, supra*, 36 Cal.2d at p. 737.) The court found "no quarrel with [the

board's] rules insofar as they relate to the regulation of the licensee and its employees in the conduct of the races and of wagering on the results thereof. However, insofar as they govern the licensee in exercising the power of exclusion of persons from *participation in the public entertainment afforded*, they may not be deemed to narrow the established right of participation by all persons on an equal basis." (*Ibid.*, italics added.)

The turf club, located inside Santa Anita Park, excluded the plaintiff based on an investigation conducted by two police officers, who concluded that he was "reputed" to be a bookmaker but was "known" as a gambler, not a bookmaker, and that his place of business attracted professional gamblers and bookmakers. (*Orloff, supra*, 36 Cal.2d at pp. 736–737.) The plaintiff had also been convicted of bookmaking and of placing a wager outside of the course. The trial court denied the plaintiff's application for an injunction to admit him to the racing area of the park, finding that "he had a reputation as a man of immoral character, was a known undesirable, and a person guilty of conduct detrimental to racing and to the public welfare." (*Ibid.*)

The Supreme Court reversed, stating: "It may be assumed that the plaintiff might be suspected of illegal gambling activities *off the racecourse*. The defendant would be justified in taking reasonable precautions to prevent opportunities for the commission of criminal activities on the course. Here, however, there is no evidence whatsoever, and it is not suggested, that the plaintiff while on the course was or ever had engaged in illegal activities or in an attempt to commit a crime. Under any proper construction and application of the statutory guides, mere suspicion based on past conduct and alleged reputed activities off the course . . . did not justify the ejection or exclusion of the plaintiff.

". . . [I]t was not the legislative intent to vest authority in the proprietor to determine primarily and in every instance what persons or classes of persons should be deemed sufficiently moral to be *admitted to the course* and thus be permitted to engage in lawful gambling. It could not have been intended that the proprietor should be confronted with the impossible task of determining who among its patrons were sufficiently moral to be *permitted to attend* and there to engage in lawful on-track gambling and who were sufficiently immoral because of suspected unlawful off-track gambling to justify exclusion from the course. . . . [I]t is a person's conduct when *entering and attending a public place* covered by the sections[, e.g., Civil Code section 53,] to which the [full accommodations] standards apply." (*Orloff, supra*, 36 Cal.2d at p. 741, italics added; see *Wynn v. Monterey Club* (1980) 111 Cal.App.3d 789, 795–798 [168 Cal.Rptr. 878] [Act permitted card club to bar compulsive gambler from premises on grounds that, at club, she issued insufficient funds checks and gambled beyond her means, thereby committing crimes and engaging in improper conduct on premises].)

In *Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721 [180 Cal.Rptr. 496, 640 P.2d 115] (*Marina Point*), the court again protected a group of individuals not expressly mentioned in the Act: families with children. To be specific, the court held that a landlord had violated the Act by refusing to rent to tenants who had children. The court reasoned: "[T]he Unruh Act does not permit a business enterprise to exclude an *entire class* of individuals on the basis of a generalized prediction that the class 'as a whole' is more likely to commit misconduct than some other class of the public.

"This proposition is clearly demonstrated by our prior decisions in *Orloff* v. *Los Angeles Turf Club, supra*, 36 Cal.2d 734, and *Stoumen* v. *Reilly, supra*, 37 Cal.2d 713. Undoubtedly the class of persons with 'reputations as to immoral character' was more likely than the general population to engage in illegal activities which a public race track legitimately would seek to prevent. *Orloff* clearly held, however, that an individual could not be excluded from the race track on the basis of such classification, but rather had a right to be judged on the basis of his own conduct. Similarly, although it may have been thought true—at least under the mores of that time—that homosexuals as a class were more likely than heterosexuals to engage in the kind of 'immoral conduct' that would justify expulsion from a public restaurant or bar . . . , in *Stoumen* we held that any such class generalization did not afford a proper basis for exclusion of all homosexuals . . . .

". . . [T]he basic rights guaranteed by [the Act] would be drastically undermined if, as the landlord contends, a business enterprise could exclude from its premises or services entire classes of the public simply because the owner of the enterprise had some reason to believe that the class, taken as a whole, might present greater problems than other groups. Under such an approach, for example, members of entire occupations or avocations, e.g., sailors or motorcyclists, might find themselves excluded as a class from some places of public accommodation simply because the proprietors could show that, as a statistical matter, members of their occupation or avocation were more likely than others to be involved in a disturbance. . . .

". . . [T]he exclusion of individuals from places of public accommodation or other business enterprises covered by the Unruh Act on the basis of class or group affiliation basically conflicts with the individual nature of the right afforded by the act of access to such enterprises. . . . 'Even a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply.' . . .

"As *Cox* makes clear, . . . under the Unruh Act[,] exclusion on the basis of a group classification is as improper when applied to 'children' or 'families with children' as it is when applied to occupational, racial, religious or other

broad 'status' classifications. . . . [I]f we were to accept the landlord's contention that a blanket exclusion of children or families with children from rental housing can be justified because children as a class are noisier, rowdier and more boisterous than adults, it would logically follow that children could uniformly be excluded from virtually all business enterprises or places of public accommodation since, like apartment complexes, most businesses can claim a legitimate interest in eliminating excessively noisy, rowdy or boisterous conduct.

■ "As our decisions in *Cox*, *Orloff* and *Stoumen* teach, although entrepreneurs unquestionably possess broad authority to protect their enterprises from improper and disruptive behavior, under the Unruh Act entrepreneurs must generally exercise this legitimate interest directly by excluding those persons who are in fact disruptive. Entrepreneurs cannot pursue a broad status-based exclusionary policy that operates to deprive *innocent* individuals of the services of the business enterprise to which [the Act] grants 'all persons' access." (*Marina Point, supra*, 30 Cal.3d at pp. 739–740, italics added & omitted, citations omitted; see *O'Connor v. Village Green Owners Assn.* (1983) 33 Cal.3d 790 [191 Cal.Rptr. 320, 662 P.2d 427] [extending *Marina Point* to age restrictions in condominiums].)

In 1991, the *Harris* court reexamined the court's prior decisions and concluded that the Act had been applied too broadly. (See *Harris, supra*, 52 Cal.3d at pp. 1152–1159.) There, in a challenge to a landlord's rental policy, the court held that the landlord could refuse to rent to applicants who did not have a gross monthly income of at least three times the monthly rent.

■ In so holding, *Harris* rejected the contention that financial or economic status was a protected characteristic under the Act. Nevertheless, the court reaffirmed the principle that the Act may protect personal characteristics not expressly enumerated therein. (*Harris, supra*, 52 Cal.3d at pp. 1159–1162.) ■ It adopted a three-part analysis to determine the Act's application in future cases. First, a claim must be based on a personal characteristic similar to those listed in the statute. "The categories [mentioned in the Act] involve personal as opposed to economic characteristics—a person's geographical origin, physical attributes, and personal beliefs." (*Harris*, at p. 1160.) When *Harris* was decided, the Act expressly prohibited discrimination based not only on race, color, religion, ancestry, and national origin—the five characteristics enumerated in the original Act (Stats. 1959, ch. 1866, § 1, p. 4424)—but also sex, added by amendment in 1974 (Stats. 1974, ch. 1193, § 1, p. 2568), and "blindness or other physical disability," added in 1987 (Stats. 1987, ch. 159, § 1, p. 1094; see *Harris*, at p. 1153). The *Harris* court rejected the rule that "any classification that

might be judicially viewed as 'arbitrary' or 'unreasonable' or 'stereotyped' is therefore subject to judicial scrutiny by virtue of the Act." (*Harris,* at p. 1157.)

Second, a court must consider whether the alleged discrimination was justified by a legitimate business reason. "[T]he California appellate cases have . . . recognized that legitimate business interests may justify limitations on consumer access to public accommodations. . . . In [several] case[s], the particular business interests . . . in maintaining order, complying with legal requirements, and *protecting a business reputation or investment* were recognized as sufficient to justify distinctions among its customers." (*Harris, supra,* 52 Cal.3d at p. 1162, italics added & citations omitted.)

Third, the consequences of allowing the claim to proceed must be taken into account. "Many . . . businesses, including lending institutions and retail and wholesale sellers, are in the position of extending money, goods, or services in exchange for promises to pay or repay in the future. They use minimum income policies as well as other financial criteria to make risk-oriented decisions regarding what customers to deal with and on what terms. These businesses, as well as others, could be subjected to legal challenges to their policies based on summary allegations that they had acted 'arbitrarily.' Plaintiffs' approach would require that each business defend its policies as 'reasonable' in a trial on the merits." (*Harris, supra,* 52 Cal.3d at p. 1167.)

■ As *Harris* explained: "[T]he economics of credit practices, whether those of landlords or other businesses, have traditionally been left to the guidance of market forces or to specific legislative and administrative action designed to address particular grievances. . . . In the absence of clear legislative direction, which the general antidiscrimination provisions of the Unruh Act do not provide, we are unwilling to engage in complex economic regulation under the guise of judicial decisionmaking." (*Harris, supra,* 52 Cal.3d at pp. 1167–1168, citations omitted.) "[T]he Act does not entirely prohibit businesses from drawing distinctions on the basis of the protected classifications or personal characteristics; rather, '[t]he objective of the Act is to prohibit businesses from engaging in *unreasonable, arbitrary or invidious discrimination.* . . .' . . . Thus, 'certain types of discrimination have been denominated "reasonable" and, therefore, not arbitrary.' " (*Howe v. Bank of America N.A.* (2009) 179 Cal.App.4th 1443, 1450 [102 Cal.Rptr.3d 506], citations omitted; see *Munson v. Del Taco, Inc.* (2009) 46 Cal.4th 661, 668–670 [94 Cal.Rptr.3d 685, 208 P.3d 623] [citing *Harris* for proposition that Act was not violated where landlord's three-month gross income requirement had "disparate impact" on female applicants, but holding that claim based on Act's requirement of access to buildings for disabled individuals does not require proof of intentional discrimination].)

■ More recently, in *Koebke v. Bernardo Heights Country Club* (2005) 36 Cal.4th 824 [31 Cal.Rptr.3d 565, 115 P.3d 1212] (*Koebke*), the court applied *Harris*'s three-part analysis, holding that a country club could not exclude from membership a lesbian couple registered under the California Domestic Partner Rights and Responsibilities Act of 2003 (Domestic Partner Act) (Fam. Code, §§ 297–299.6). In *Koebke*, the court commented that the personal characteristics enumerated in the Act "represent traits, conditions, decisions, or choices *fundamental* to a person's *identity, beliefs and self-definition.*" (*Koebke*, at pp. 842–843, italics added.)

Analogizing domestic partnerships to marriage, the *Koebke* court distinguished *Harris*: "[M]arital status is more like the existing categories to which the Act applies than it is to economic status. The kinds of intimate relationships a person forms and the decision whether to formalize such relationships implicate deeply held personal beliefs and core values. . . . [M]arriage itself is defined as 'a personal relation arising out of a civil contract between a man and a woman . . . .' ([Fam. Code,] § 300.) Similarly, the decision whether to enter into a domestic partnership is motivated by personal values and beliefs. This point was recognized by the Legislature in its characterization of these relationships in the Domestic Partner Act as 'lasting, committed, and caring,' and undertaken by two individuals to 'share lives together, participate in their communities together, and [for] many [to] raise children and care for other dependent family members together.' " (*Koebke, supra*, 36 Cal.4th at p. 843.)

In *Koebke*, the court went on to explain that the country club's stated reasons for excluding the plaintiffs from membership—to avoid "overuse of its facilities" and to "creat[e] a family-friendly environment"—were not legitimate business interests in light of the purpose of the Domestic Partner Act. (*Koebke, supra*, 36 Cal.4th at p. 847.) The court also concluded that allowing domestic partner claims under the Unruh Civil Rights Act would not have adverse consequences because only registered domestic partners, not all unmarried couples, could pursue such a claim. (*Koebke*, at p. 848.)

In the wake of *Harris*, the Courts of Appeal have held that a restaurant did not have to protect a nonsmoker from cigarette smoke drifting into the nonsmoking section where a local ordinance permitted the restaurant to have smoking and nonsmoking areas (*King v. Hofer* (1996) 42 Cal.App.4th 678, 683–684 [49 Cal.Rptr.2d 719]), a commercial landlord could refuse to rent office space to a podiatrist on the ground that the office building was intended to provide space for medical doctors (*Roth v. Rhodes* (1994) 25 Cal.App.4th 530, 538–539 [30 Cal.Rptr.2d 706]), and a sports bar and a county fair could, for security reasons, exclude members of motorcycle clubs who were wearing insignia identifying the club to which they belonged (*Hessians Motorcycle Club v. J.C. Flanagans* (2001) 86 Cal.App.4th 833, 838–839 [103 Cal.Rptr.2d

552] [sports bar]; *Gatto v. County of Sonoma, supra,* 98 Cal.App.4th at pp. 765–769 [county fair]).

In 2005, the Legislature amended the Act to add "marital status" and "sexual orientation" to the list of protected characteristics. (Stats. 2005, ch. 420, § 3, p. 3514.) As the Legislature declared in passing the amendments: "[P]rior to passage of the Unruh Civil Rights Act, California law afforded broad protection against arbitrary discrimination by business establishments. The Unruh Civil Rights Act was enacted to provide broader, more effective protection against arbitrary discrimination. California's interest in preventing that discrimination is longstanding and compelling. [¶] . . . In keeping with that history and the legislative history of the Unruh Civil Rights Act, California courts have interpreted the categories enumerated in the act to be illustrative rather than restrictive. It is the intent of the Legislature that these enumerated bases shall continue to be construed as illustrative rather than restrictive. [¶] . . . The Legislature affirms that the bases of discrimination prohibited by the Unruh Civil Rights Act include, but are not limited to, marital status and sexual orientation . . . . By specifically enumerating these bases in the Unruh Civil Rights Act, the Legislature intends to clarify the existing law, rather than to change the law, as well as the principle that the bases enumerated in the act are illustrative rather than restrictive." (Stats. 2005, ch. 420, § 2, p. 3013; see *Hubert v. Williams* (1982) 133 Cal.App.3d Supp. 1, 3 [184 Cal.Rptr. 161] [Act precluded landlord from evicting quadriplegic tenant and his 24-hour lesbian attendant based on attendant's sexual orientation and quadriplegic's association with gay and lesbian individuals].)

In light of the foregoing cases and principles, we now apply *Harris*'s three-part analysis to the facts of this case.[3]

### 1. *Comparison of Felon Status to Enumerated Characteristics*

At the outset, we have difficulty with the concept that being a felon is a personal characteristic representing a trait, condition, decision, or choice *fundamental* to a person's *identity, beliefs and self-definition* as that factor has been applied in previous cases. (See, e.g., *Koebke, supra,* 36 Cal.4th at pp. 842–843; *Stoumen, supra,* 37 Cal.2d at pp. 716–717; *Cox, supra,* 3 Cal.3d at pp. 217–218.) The Act's enumerated characteristics are not associated with unlawful conduct harmful to society. (See, e.g., *Marina Point, supra,* 30 Cal.3d at p. 739, discussing *Stoumen.*) They "implicate deeply held personal beliefs and core values." (*Koebke,* at p. 843.) Being a felon, however, denotes

---

[3] In the trial court, the parties discussed all three *Harris* factors in their memoranda. On appeal, they initially briefed only the first factor. We therefore requested supplemental briefing on the other two factors and have read the parties' submissions.

illegal activity detrimental to the community. And Semler's status as a felon is not analogous to having a *lawful* occupation. (Cf. *Sisemore v. Master Financial, Inc.* (2007) 151 Cal.App.4th 1386, 1402–1409 [60 Cal.Rptr.3d 719] [mortgage lender violated Act by denying applicant's loan application solely on ground she was a licensed operator of a family daycare home]; *Long v. Valentino* (1989) 216 Cal.App.3d 1287, 1292–1293, 1297 [265 Cal.Rptr. 96] [staff attorney employed by civil rights organization violated Act by ejecting police officer from conference on police practices where ejection was based solely on officer's occupation]; *Long*, at p. 1297 ["an announcement such as 'You can't eat in my diner because you are a lawyer, bricklayer, female, or Indian chief' would be actionable under the Unruh Act"]; *Marina Point*, at p. 726 ["Whether the exclusionary policy rests on the alleged undesirable propensities of those of a particular race, nationality, *occupation*, political affiliation, or age, . . . the Unruh Act protects individuals from . . . arbitrary discrimination." (italics added)].)

Further, individuals who fall within the Act's expressly listed categories are generally not restricted by other laws with respect to their rights and privileges. In contrast, a felon loses many freedoms enjoyed by nonfelons. "Some of the more common [restrictions] include disqualification from jury service, impeachment as a witness, inaccessibility to firearms, and registration as a sex offender. In addition, a felony conviction may disqualify the person from practicing many licensed trades and professions and from holding certain positions of public employment. Under prior law, persons convicted of 'infamous crimes' were disenfranchised even after sentence was complete. However, a convicted felon who is not imprisoned or on parole can now vote." (*People v. Ansell* (2001) 25 Cal.4th 868, 872–873 [108 Cal.Rptr.2d 145, 24 P.3d 1174], fns. omitted.)

According to another authority, "[c]onvicted felons are disqualified from being able to serve on a federal jury for life, they might be unable [to] enlist in the armed forces, they can be evicted from public housing, they can be permanently barred from receiving food stamps and other Social Security benefits, and their property may be subject to forfeiture. In addition, although a convicted felon cannot be excluded from [federal] public employment, the felony can be 'a factor in determining suitability for it.' " (Note, *An Act of Criminal "Skullduggery"?: A Critical Analysis of the Circuit Split Resolved in* United States v. Abuelhawa (2010) 112 W. Va. L.Rev. 1023, 1043–1044, fns. omitted (hereafter *An Act of Criminal "Skullduggery"?*).)

On the other hand, a felon does enjoy a few pertinent constitutional rights. He or she has the constitutional right to procreate (*Skinner v. Oklahoma* (1942) 316 U.S. 535, 541 [86 L.Ed. 1655, 62 S.Ct. 1110]) and to marry (*Turner v. Safley* (1987) 482 U.S. 78, 94–99 [96 L.Ed.2d 64, 107 S.Ct. 2254]). In

addition, parolees have a constitutional right to be free from unreasonable parole restrictions. (*In re E.J.* (2010) 47 Cal.4th 1258, 1282, fn. 10 [104 Cal.Rptr.3d 165, 223 P.3d 31]; see, e.g., *In re Stevens* (2004) 119 Cal.App.4th 1228, 1233–1234, 1239 [15 Cal.Rptr.3d 168] [condition of parole prohibiting convict from using personal computer and accessing Internet was unreasonable because conviction did not involve access to Internet].)

■ If a particular subject area is highly regulated by statute, courts are less likely to find that the Act applies to an individual covered by those regulations. (See *King v. Hofer, supra,* 42 Cal.App.4th at p. 684 [nonsmokers are unprotected by Act in part because smoking in restaurants is "widely regulated"].) As discussed, felons are covered by numerous statutes governing their postincarceration rights and privileges. Such extensive regulation suggests that the Act should not be extended to cover felons.

In construing the Act, we also think it significant that felons are not protected by "large bodies of statutory and constitutional law on both state and federal levels designed to protect classes of persons who have achieved historical recognition as distinct objects of adverse treatment by public and private entities, e.g., Blacks, Hispanics, and women." (*Harris, supra,* 52 Cal.3d at p. 1161, fn. 9.) And, of course, with respect to *state* crimes, a reformed felon may take advantage of two distinct statutory procedures in an effort to restore his or her rights and privileges. (See *People v. Ansell, supra,* 25 Cal.4th at pp. 873–877 & fns. 11, 14–17.)

■ "In sum, there is no support in the language or history of the Unruh Act for [Semler's] contention that [being a felon is] within its scope." (*Harris, supra,* 52 Cal.3d at pp. 1161–1162.)

### 2. *Legitimate Business Interests*

■ "[B]usinesses subject to the Unruh Act retain[] the right to 'establish reasonable regulations that are *rationally related* to the services performed and facilities provided.' " (*Harris, supra,* 52 Cal.3d at p. 1152, italics added; accord, *id.* at p. 1157, fn. 6; *Ross v. Forest Lawn Memorial Park* (1984) 153 Cal.App.3d 988, 993 [203 Cal.Rptr. 468].)

As a lender, GE Capital had an unquestionable interest in making sure the loan was repaid. In addressing a similar situation, a federal court stated: "[T]he bank's inquiry into an applicant's criminal record provides relevant information about an applicant's creditworthiness, particularly his judgment and character. . . . [B]ecause an applicant's judgment and character may legitimately be considered in making commercial lending decisions, [the] Bank's practice of considering criminal history as it relates to character and

judgment bears a legitimate and manifest relationship to the extension of credit." (*A.B. & S. Auto Service, Inc. v. South Shore Bank of Chicago* (N.D.Ill. 1997) 962 F.Supp. 1056, 1064.) "[A] prudent lender would want to know whether it was lending money to a convicted felon . . . ." (*In re Shavers* (Bankr. S.D.Miss. 2009) 418 B.R. 589, 611.)

 Semler's criminal convictions raised questions about his honesty and trustworthiness. (See, e.g., Evid. Code, § 788 [credibility of witness in civil or criminal proceeding may be attacked by evidence he or she has been convicted of felony]; Cal. Const., art. I, § 28, subd. (f)(4) [permitting use of prior felony conviction for purposes of impeachment in criminal proceeding]; *People v. Ansell, supra,* 25 Cal.4th at p. 873 & fn. 7 [listing public occupations for which criminal conviction alone disqualifies person from holding position].) By analogy, a commercial lending institution is not obligated to make a loan to a limited liability company if a member of its managing member does not appear to be creditworthy or trustworthy. (See *A.B. & S. Auto Service, Inc. v. South Shore Bank of Chicago, supra,* 962 F.Supp. at p. 1064 [criminal record is a relevant and legitimate criterion in determining creditworthiness].)

In addition, GE Capital was not merely a lender in this case. As alleged in the complaint, it was also an "equity participant"; it made an "equity investment" in ARI Overland. Semler wanted to invest in ARI Overland's managing member, Overland Management. That would have made the parties co-investors in a single enterprise. GE Capital's capacity as an investor arose from the nature of the loan it was to make: a mezzanine loan. Much has been written about the unique aspects of such a loan.

"[M]ezzanine financing can be used to fill the gap between the financing provided by the first mortgage, which generally will not exceed 70–85% of the purchase price, and the remaining portion that must be funded by the developer or by the developer's obtaining a second mortgage on the property.

"Where mezzanine financing is involved, the mezzanine lender typically supplies financing of 50–90% of the project's required equity contributions or capital structure cost, that is, the portion of the required contribution in excess of the amount funded by the first mortgage. The required equity includes, but is not limited to, the balance of the purchase price not funded by the senior mortgage.

"Many types of financial institutions have engaged in mezzanine financing transactions, including investment banks, stock funds, banks, and insurance companies. Mezzanine financing takes a variety of forms, including hybrid financial products with many equity characteristics, such as equity kickers

and a participating return. Most often, it involves extending credit to the partners, members, or other equity owners of the borrower (rather than directly to the borrower, as is the case with the first mortgage and the traditional second mortgage) and taking a pledge of such parties' equity interests in the borrower. Alternatively, and not as frequently, the mezzanine lender may take a preferred equity position in the borrower directly—that is, an interest which entitles· the lender to distributions of excess cash flow after debt service, ahead of any distributions or other payments to the borrower's principals. Yet another approach is to combine a senior mortgage with mezzanine financing at a combined loan to value ratio of 90–95% at a rate that may be blended or kept separate. In the latter case, the senior lender and the mezzanine lender are the same entity. . . .

". . . Since the mezzanine lender (as opposed to the first mortgage lender) is not secured by a mortgage lien against the property, the mezzanine lender's interest is exposed to greater risk than that of a second mortgage lender in a conventional mortgage transaction. Thus, to compensate the lender for such risk, the 'blended' interest rate paid by the senior and mezzanine borrowers is substantially greater than the rate paid to a secured mortgage lender. Often the interest rate on a mezzanine loan will fluctuate (in contrast with a fixed rate, which is common for senior mortgage debt). Also, the mezzanine lender may insist on a certain level of control over the borrower's business as a means to protect the mezzanine lender's investment." (Calderon, *Mezzanine Financing and Land Banks: Two Unconventional Methods of Financing Residential Real Estate Projects in the 21st Century* (2001) 29 Real Est. L.J. 283, 287–288, fns. omitted (hereafter *Mezzanine Financing and Land Banks*).)

"The interest of the senior lender is similar to that of the senior lender in the conventional real estate financing transaction . . . . The mezzanine lender is also a lender, but not with respect to the entity which owns the property, and hence has no interest in the property. Instead, the lender's interest varies depending upon the type of mezzanine structure. For example, the mezzanine lender may have a security interest in the shares of stock, partnership interest, or other equity interest in the entity that owns the property." (*Mezzanine Financing and Land Banks, supra*, 29 Real Est. L.J. at p. 290.)

" '[T]ypically, . . . all mezzanine financing refers to debt that is subordinate to another type or class of debt but senior to equity. . . . [¶] In the real estate capital markets, the term "mezzanine financing" . . . refers to debt that sits between senior debt and the borrower's equity. . . . [M]ezzanine debt is junior to the mortgage loan but senior to the borrower's equity. A mezzanine loan in the real estate industry typically refers to debt that is secured solely by the mezzanine borrower's indirect ownership of the mortgage borrower—the

entity that actually owns the income producing real property. This same underlying real property also serves as collateral for the senior mortgage lender. [¶] In a mezzanine loan, neither the mezzanine borrower nor lender actually holds any direct real property interest in the underlying land serving as collateral. Rather, their respective interests are derived solely from the mezzanine borrower's (direct or indirect) ownership of the equity in the underlying mortgage borrower. The mezzanine borrower grants to the mezzanine lender a lien on its equity in the mortgage borrower pursuant to a written instrument (typically a security agreement), and thereafter the mezzanine lender holds an effective lien on the collateral at least vis-à-vis the mezzanine borrower.' " (*GreenLake Capital, LLC v. Bingo Investments, LLC* (2010) 185 Cal.App.4th 731, 741–742 [111 Cal.Rptr.3d 82], italics omitted.)

As an equity participant in ARI Overland, a limited liability company, GE Capital had the right to insist on working with a managing member, Overland Management, it could trust. No law prohibited it from rejecting as a co-investor a felon who, according to the superseding information, "would and did falsify, conceal and cover up by a trick, scheme and device material facts, and would and did make and cause the making of false, fictitious and fraudulent statements and entries, in a matter within the jurisdiction of the United States Department of Commerce and the United States Customs Service, by causing freight forwarders to file false export control documents concealing or misstating the ultimate destination of export shipments."

Further, under the Act, a lender-investor has a reasonable interest in "protecting [its] business reputation." (*Harris, supra,* 52 Cal.3d at p. 1162; see *Ojala v. Bohlin* (1960) 178 Cal.App.2d 292, 303–304 [2 Cal.Rptr. 919] [injury to business reputation is compensable in damages].) GE Capital's association with a felon who conspired to falsify customs documents and sell munitions to Syria could harm its reputation in the community and result in a loss of business. (Cf. 31 C.F.R. § 542.201(a) (2010) [prohibiting significant contributions to Syria's military].) According to the Council on Foreign Relations, Syria "has been on the State Department list of countries sponsoring terrorism since the list's inception in 1979." (Council on Foreign Relations, State Sponsor: Syria <http://www.cfr.org/syria/state-sponsor-syria/p9368> [as of June 29, 2011].) And "[t]he Syrian government [has] continued to provide political and material support to Hizballah and political support to Palestinian terrorist groups." (U.S. Dept. of State, Diplomacy in Action, State Sponsors of Terrorism Overview <http://www.state.gov/s/ct/rls/crt/2006/82736.htm> [as of June 29, 2011].) Semler's crimes involved a politically sensitive subject that could reflect poorly on a company that invited him to become a member of management. GE Capital had a legitimate interest in protecting its good will by refusing to participate in a venture with Semler given the nature of his crimes.

Semler counters that he was a "passive" investor, with no legal right to manage ARI Overland, no authority to make decisions on its behalf, and no personal responsibility to repay the loan. His investment of $250,000 was to be paid "up front." But all of that is beside the point. Semler asks us to assume he could be trusted to comply with any limitations on his control of the enterprise. (See Corp. Code, §§ 17005, 17103, 17150 [operating agreement and articles of organization may limit authority of members of limited liability company, govern their voting rights, and set forth their rights and duties with respect to management of company], 17101, subds. (a), (b) [member of limited liability company is not liable for company's debts except to extent shareholder of corporation would be liable for debts under law of contracts or torts], 17151 [articles of organization may provide that management is vested in one or more members of limited liability company], 17157 [unless otherwise stated in articles of organization, every member of limited liability company is agent of company with authority to bind it].)

But GE Capital was entitled to take into consideration that Semler might act in an unlawful manner, justifying its insistence that he be excluded as a member of, and an investor in, Overland Management. (See, e.g., *BankPlus v. Kinwood Capital Group, LLC* (S.D.Miss. 2009) 430 B.R. 758 [where limited liability company consisted of two members, one member acted without authority by transferring company property to his own business and then obtaining personal loans using transferred property as collateral]; *In re Young* (Bankr. D.N.J. 2008) 384 B.R. 94, 100–102 [member of limited liability company holding 50 percent interest made unauthorized payments to himself]; *In re Avalon Hotel Partners, LLC* (Bankr. D.Or. 2003) 302 B.R. 377, 379–381 [managing member of limited liability company filed bankruptcy petition on behalf of company without authority]; *Stoker v. Bellemeade, LLC* (2005) 272 Ga.App. 817, 829–830 [615 S.E.2d 1] [one member of two-member limited liability company was unauthorized to bring counterclaims against other member on behalf of company, resulting in their dismissal], overruled on another point in *Bellemeade, LLC v. Stoker* (2006) 280 Ga. 635 [631 S.E.2d 693].) It is immaterial that Semler would have been a member of the managing member (Overland Management) of the borrower (ARI Overland) as opposed to a member of the borrower itself. His ability to engage in conduct harmful to the venture, with or without authority, was still a possibility of legitimate concern. Just as Semler had violated the laws of the United States by engaging in a conspiracy to sell munitions to Syria, he could have disregarded the limitations on his authority as a passive investor in pursuit of a personal goal.

Through a combination of state and federal laws, a felon may not serve on a jury, live in public housing, receive Social Security benefits, or hold certain positions in private and public employment. (See *People v. Ansell, supra*, 25 Cal.4th at pp. 872–873 & fns. 3, 7; *An Act of Criminal "Skullduggery"?,*

*supra*, 112 W. Va. L.Rev. at pp. 1043–1044.) It is therefore unlikely the California Legislature intended the Act to protect a felon's desire to be a co-investor with a commercial lender in a business venture.

In short, Semler's criminal record suggested he might engage in some form of mischief, not legally authorized, that would jeopardize ARI Overland's success, thereby risking full repayment of GE Capital's loan and possibly resulting in a lower than expected return on GE Capital's equity investment in the enterprise.

This case does not raise the issue presented in cases like *Cox, Stoumen, Orloff,* or *Marina Point,* where the courts determined whether a patron's conduct on the defendant's premises was sufficiently disruptive or harmful to warrant his or her exclusion or ejectment. Those cases concerned the public accommodations aspect of the Act. "[T]he Legislature was undoubtedly concerned with the safety and welfare of *the attending public*. The general objective was the *protection of others on the premises.*" (*Orloff, supra,* 36 Cal.2d at p. 740, italics added.) We are not concerned, for example, with a hotel's refusal to provide Semler with a room or a restaurant's refusal to serve him a meal. We may even assume Semler conducted himself in a professional manner if he was ever on GE Capital's premises.

The question in this case is whether the Act required a commercial lender-investor to enter into an *ongoing business relationship* with a limited liability company even though the managing member included a felon. The focus here is on the felon's potential threat to that relationship—the possibility that he would engage in wrongful conduct on *or off* the lender's premises that could adversely affect the enterprise. A felon loses several rights and privileges precisely because the law recognizes that a felony conviction is indicative of traits like dishonesty and untrustworthiness. (See *People v. Ansell, supra,* 25 Cal.4th at pp. 872–873 & fns. 3–9; *An Act of Criminal "Skullduggery"?, supra,* 112 W. Va. L.Rev. at pp. 1043–1044.) Thus, GE Capital could permissibly consider Semler's status as a felon in declining to make a loan to, and be a co-investor in, a business venture where Semler would be a member of the borrower's management.

### 3. *Consequences of Allowing Semler's Claim*

"All economic decisions involve choices and hence require decision makers to discriminate between alternatives in making these choices." (*Roth v. Rhodes, supra,* 25 Cal.App.4th at p. 538.) A commercial lending institution that invests in its borrowers' ventures has a sufficient interest in "protecting . . . [its] investment . . . to justify distinctions among its customers." (*Harris, supra,* 52 Cal.3d at p. 1162.) The lending institution, not a court, is

in a better position to decide what criteria—including which aspects of a criminal conviction—should be used in making loans and investments.

"[Semler's] view of the Act would involve the courts of this state in a multitude of microeconomic decisions we are ill equipped to make. . . .

"A trial in such a case would explore issues such as what general [borrower-investor] selection criteria are the best predictors of default; what weight should be given to each criterion; what threshold criteria, if any, are permissible; and what must be shown and by whom to validate general or threshold criteria. The trial would devolve into a battle of economic studies and experts, with each side arguing from statistical and other evidence in support of its favorite criteria. And the outcome would be of little value to the parties (because the various economic factors involved are subject to constant change) or to anyone else (because the fact-specific decision would not allow other [commercial lending institutions] to predict what [criteria], if any, would pass muster). . . . [T]he issue of what criteria could be used by [lender-investors] could be tried and retried across the state as an issue of fact, with no prospect of certainty or stability in the respective rights and duties of the parties." (*Harris, supra*, 52 Cal.3d at p. 1166.)

"[T]he economics of credit practices, whether those of landlords or other businesses, have traditionally been left to the guidance of *market forces* or to *specific legislative and administrative action* designed to address *particular* grievances." (*Harris, supra*, 52 Cal.3d at p. 1167, italics added.) That tradition applies here. Semler's claim is better left to resolution, if any, by market forces and *specific* legislative or administrative action tailored to his particular concern, not by expanding the scope of the Act. A lender-investor, not the judiciary, should decide such questions as whether a felony is sufficiently serious, recent, and indicative of dishonesty to warrant the denial of a loan when combined with an equity investment. "[W]e are unwilling to engage in complex economic regulation under the guise of judicial decision-making." (*Harris, supra*, 52 Cal.3d at p. 1168.)

█ Thus, under the analysis established in *Harris*, we conclude GE Capital, acting through GEBAM, Inc., did not violate the Act by denying a loan to, and by declining to invest in, a limited liability company where a member of its managing member was a felon.

## B. *Civil Code Section 51.5*

By statute, "[n]o business establishment of any kind whatsoever shall discriminate against, boycott or blacklist, or refuse to buy from, contract with, sell to, or trade with any person in this state on account of any

characteristic listed or defined in [the Act], or of the person's partners, members, stockholders, directors, officers, managers, superintendents, agents, employees, business associates, suppliers, or customers, because the person is perceived to have one or more of those characteristics, or because the person is associated with a person who has, or is perceived to have, any of those characteristics." (Civ. Code, § 51.5, subd. (a).)

In the complaint, Semler refers to his claims under Civil Code sections 51 and 51.5 as arising under the Act. That is incorrect. The Act is contained solely in Civil Code section 51. (See Civ. Code, § 51, subd. (a); *Stamps v. Superior Court, supra*, 136 Cal.App.4th at pp. 1450–1451 & fn. 10; *Alch v. Superior Court* (2004) 122 Cal.App.4th 339, 395 [19 Cal.Rptr.3d 29].) The Act (Civ. Code, § 51) was passed in 1959 (see Stats. 1959, ch. 1866, § 1, p. 4424), while Civil Code section 51.5 was enacted in 1976 (see Stats. 1976, ch. 366, § 1, p. 1013). The Legislature passed the Act to remedy discrimination in public accommodations (see *Cox, supra*, 3 Cal.3d at pp. 212–214); in passing Civil Code section 51.5, the Legislature was motivated by the Arab League's boycott of Israel and a concern that Arab-owned businesses in California would not sell products or services to Jews (see Sen. Com. on Judiciary, Rep. on Assem. Bill No. 2553 (1975–1976 Reg. Sess.) as amended Jan. 22, 1976, p. 2; Review of Selected 1976 California Legislation (1977) 8 Pac. L.J. 194, 201–203 [business associations and professions; business discrimination].)

Nevertheless, putting aside the mistaken reference to the statutes, the analysis under Civil Code section 51.5 is the same as the analysis we have already set forth for purposes of the Act. This conclusion is compelled by the plain language of Civil Code section 51.5—which parallels that of the Act—and the section's legislative history. (See Legis. Counsel's Dig., Assem. Bill No. 2553 (1975–1976 Reg. Sess.) 4 Stats. 1976, Summary Dig., p. 95 [discussing Act in connection with enactment of Civ. Code, § 51.5]; Assem. Com. on Judiciary, Bill Digest of Assem. Bill No. 2553 (1975–1976 Reg. Sess.) hearing Jan. 19, 1976, pp. 1–2 [questioning whether Civ. Code, § 51.5 is necessary in light of existing protection afforded by Act]; see also *Jackson v. Superior Court* (1994) 30 Cal.App.4th 936, 941 & fn. 3 [36 Cal.Rptr.2d 207]; *Roth v. Rhodes, supra*, 25 Cal.App.4th at p. 537; *Strother v. Southern California Permanente Medical Group* (9th Cir. 1996) 79 F.3d 859, 875 & fn. 19.) Simply put, GE Capital did not violate Civil Code section 51.5 by declining to "contract with" a company where the contract involved making a loan to, and becoming an equity investor in, a business enterprise, and a felon was a member of the borrower's management.

It follows that Semler failed to allege a violation of the Act or Civil Code section 51.5, and the trial court properly dismissed the case on demurrer.

## III

## DISPOSITION

The order is affirmed.

Rothschild, J., and Johnson, J., concurred.

A petition for a rehearing was denied July 19, 2011, and appellant's petition for review by the Supreme Court was denied October 19, 2011, S195565. Chin, J., and Corrigan, J., did not participate therein.